Rex Paving Corporation, Respondent-Appellant, v Franklin E. White, as Commissioner of Transportation of the State of New York, et al., Appellants-Respondents.

Third Department, July 7, 1988

## APPEARANCES OF COUNSEL

*Robert Abrams, Attorney-General (Lawrence S. Kahn* and *Richard J. Dorsey* of counsel), for appellants-respondents.

*Hayes & Hayes (Harry R. Hayes, III,* of counsel), for respondent-appellant.

*Mid-Atlantic Legal Foundation, Inc. (Martin S. Kaufman* and *Douglas Foster* of counsel), *amicus curiae.*

*Gold, Farrell & Marks (Martin R. Gold, Robert P. Mulvey* and *Elena Salerno Flash* of counsel), for Lawyers' Committee for Civil Rights Under Law, *amicus curiae.*

## OPINION OF THE COURT

WEISS, J.

The issue before us is whether Highway Law § 85, Transportation Law § 428, and the Prison Construction Act (McKinney's Uncons Laws of NY § 6267 [L 1983, ch 56, as amended]) empower defendants, the State Commissioners of Transportation and General Services, to promulgate and implement affirmative action programs in favor of disadvantaged business enterprises (hereinafter DBE).[1] This concept of aiding DBEs came to fruition when Congress implemented a temporary minority business enterprise set-aside plan as part of the Public Works Employment Act (hereinafter PWEA) of 1977 *(see,* 42 USC § 6705 [f] [2]), based upon Congressional findings that minorities were denied effective participation in public contracts at the Federal, State and local levels. The constitutionality of the PWEA was upheld in *Fullilove v Klutznick* (448 US 448). Subsequent legislation has continued the Federal DBE program for Federally assisted highway projects, requiring recipients of Federal transportation funds to estab-

---

1. The State Department of Transportation has actually implemented a "disadvantaged/minority/women enterprise program". The State Office of General Services has established a "minority and women owned business enterprise program". For ease of reference, the term DBE will refer to and include disadvantaged business enterprises, minority business enterprises and women business enterprises, unless otherwise indicated.

lish DBE programs modeled after the PWEA *(see,* Surface Transportation Assistance Act of 1982, Pub L 97-424, § 105 [f]; Surface Transportation and Uniform Relocation Assistance Act of 1987, Pub L 100-17, § 106 [c]). Today, a DBE program is mandatory for all recipients of Federal highway money (49 CFR 23.41 [a]), although the regulations allow flexibility in the actual percentage of each contract let to DBEs and allow a waiver if the contractor acts in good faith to satisfy the program goal (49 CFR 23.43 [d] [2]; 23.45 [h]). As the recipient of some $500 million annually, the State Department of Transportation (hereinafter DOT) is required to promulgate a DBE program in accord with Federal law. Highway Law § 85 and Transportation Law § 428 (1) also compel DOT's adherence to the Federal guidelines. Accordingly, since about 1980, DOT has implemented a DBE program through standard language incorporated into all its contracts, even though not subsidized by Federal money.

The Prison Construction Act (hereinafter the Act) was enacted by the Legislature in 1983 to help finance the construction of correctional facilities (McKinney's Uncons Laws of NY § 6267 [L 1983, ch 56]). The Act specifically requires all contracting agencies, including the State Office of General Services (hereinafter OGS), to "seek meaningful participation * * * by minority business enterprises and * * * establish measures and procedures" to ensure that DBEs receive an appropriate share of the awarded contracts (McKinney's Uncons Laws of NY § 6267 [L 1983, ch 56, § 12 (3)]). OGS has thus incorporated a DBE program, which mirrors the program employed by DOT, into its standard contract language, even for contracts not funded by the Act. Significantly, the DBE program is only mandatory for prison-related contracts.

In March 1987, plaintiff, a domestic corporation which supplies materials and services as both a general contractor and subcontractor for public improvement projects, commenced this action, originally designated a proceeding pursuant to CPLR article 78, seeking a declaration that defendants' DBE programs are illegal and unlawful because defendants acted without legislative authority, because defendants violated the State Administrative Procedure Act, and because the programs deny plaintiff its right to equal protection under the NY Constitution. Supreme Court initially denied defendants' motion to dismiss for lack of standing and converted the proceeding to a declaratory judgment action. Thereafter, Supreme Court partially granted plaintiff's motion for summary

judgment and upheld defendants' DBE programs only to the extent required by Federal law and the Act. Specifically, Supreme Court declared OGS' DBE program invalid where applied to contracts not funded by the Act *(see, Matter of Fullilove v Beame,* 48 NY2d 376) and invalidated DOT's program with respect to State-funded contracts on the premise that only the Legislature or Governor could promulgate affirmative action plans. Additionally, Supreme Court emphasized defendants' failure to file the programs with the Secretary of State *(see,* State Administrative Procedure Act § 102 [2]; § 203). Defendants appeal from that portion of the order declaring their DBE programs invalid and plaintiff cross-appeals from Supreme Court's decision to uphold the programs as applied to contracts using Federal or Act funds, as well as Supreme Court's failure to address its equal protection argument.

■ Initially, we reject defendants' standing argument. In *Matter of City of New York v City Civ. Serv. Commn.* (60 NY2d 436), the Court of Appeals described a three-part zone of interest test for standing to obtain review of administrative decisions as follows: "(1) the interest asserted must be arguably within the zone of interest to be protected by the statutory or constitutional provisions sought to be enforced; (2) the administrative decision for which review is sought must be shown to have a harmful effect upon the party asserting standing; and (3) there must be no clear legislative intent negating review" *(supra,* at 442-443). *(See also, Matter of Bradford Cent. School Dist. v Ambach,* 56 NY2d 158, 163-164; *Matter of Dairylea Coop. v Walkley,* 38 NY2d 6, 10-11.) Here, plaintiff seeks to preserve its right to compete for public contracts on the same terms as others, an interest the Equal Protection Clause may protect *(see,* NY Const, art I, § 11). Second, plaintiff has sufficiently alleged that the DBE programs may have a harmful effect upon its ability to obtain contracts because of the preference to be given DBEs *(see, Matter of City of New York v City Civ. Serv. Commn., supra,* at 443; *Matter of New York State Assn. of Community Action Agency Bd. Members v Shaffer,* 119 AD2d 871, 874-875). While the allegations of injury are concededly vague, standing need not be justified by injury-in-fact in every instance *(see, Matter of Sun-Brite Car Wash v Board of Zoning & Appeals,* 69 NY2d 406, 413). Third, we do not perceive any legislative intent to bar review of defendants' DBE programs. Moreover, judicial review of these programs may otherwise be avoided *(see, Matter of New York State Assn. of Community Action Agency*

*Bd. Members v Shaffer, supra,* at 875; *New York State Coalition for Criminal Justice v Coughlin,* 103 AD2d 40, 43, *affd* 64 NY2d 660). In sum, we find that the potential effect on plaintiff's ability to participate in government contracts warrants a recognition of standing to challenge defendants' DBE programs.

■ Plaintiff maintains that the DBE programs are illegal because defendants lacked specific legislative authorization to implement such remedial measures. Analogizing to *Boreali v Axelrod* (71 NY2d 1), plaintiff asserts that defendants unlawfully usurped the lawmaking function of the Legislature. We hold otherwise. It is well established that the Executive may not mandate an affirmative action program, such as the DBEs at issue here, absent a specific legislative grant of authority *(Subcontractors Trade Assn. v Koch,* 62 NY2d 422, 429; *Matter of Fullilove v Beame,* 48 NY2d 376, *supra; Matter of Broidrick v Lindsay,* 39 NY2d 641; *Matter of Fullilove v Carey,* 62 AD2d 798, *affd* 48 NY2d 826). We find that defendants promulgated the challenged DBE programs with the necessary legislative authorization. Our reasons follow.

In Highway Law § 85, the Legislature expressly authorized DOT to pursue all measures necessary to comply with the Federal aid highway acts and accompanying regulations *(see, Matter of Brown v McMorran,* 23 AD2d 661). Notably, the State's eligibility for Federal highway funds hinges upon compliance with these regulations *(see,* 49 CFR 23.2, 23.41 [a] [1]). One such condition is the State's implementation of a suitable DBE program *(see,* 49 CFR 23.41 [a]). In addition, Transportation Law § 428 (1) requires DOT to comply with "federal laws relative to participation of minority and women-owned business enterprises" where Federal financial assistance is received on transportation infrastructure projects *(see also,* Transportation Law § 421 [1], [5]). We conclude, as did Supreme Court, that these statutory provisions provide clear legislative authorization for DOT's programs insofar as Federally funded contracts are concerned.

■ ■ The further question is whether the Legislature authorized a similar DBE program for exclusively State-funded contracts. Transportation Law § 428 (2) provides, with respect to State transportation infrastructure renewal projects, that "[t]he governor shall establish measures and procedures to secure meaningful participation" by DBEs *(see,* Transportation Law § 428 [3]). Thus, as Supreme Court correctly observed, since the Governor had not acted under this

direct grant of authority, DOT's DBE program was invalid as applied to State contracts. The Governor has since acted and, by letter dated March 7, 1988, empowered and directed DOT to implement a DBE program for all transportation infrastructure renewal projects in accord with attached procedures and guidelines.[2] The Governor further authorized DOT to adopt procedures and guidelines necessary to administer the program. Acting accordingly, DOT filed the regulations governing its DBE program with the Secretary of State on March 8, 1988. Consequently, the only barrier to DOT's program, the Governor's directive, has been cleared. It follows that DOT's DBE program as applied to State-funded contracts is legislatively authorized.

■ We reach a similar conclusion with respect to OGS. The Act expressly requires each "contracting agency" to implement a DBE program for contracts it finances (McKinney's Uncons Laws of NY § 6267 [L 1983, ch 56, § 12 (1), (2), (3)]). To effectuate its provisions, the Act specifically charges OGS with monitoring the DBE program (McKinney's Uncons Laws of NY § 6267 [L 1983, ch 56, § 12 (5)]). Thus, as Supreme Court properly held, OGS' program enjoys clear legislative authorization with respect to contracts funded by the Act. The challenged program, however, is not so limited, and extends to other OGS construction contracts. While an executive body may not unilaterally mandate an affirmative action program, it may establish the framework for a voluntary program *(see, Matter of Fullilove v Beame,* 48 NY2d 376, *supra).* Following

2. ■ The Governor's letter and the regulations promulgated and filed by DOT on March 8, 1988 *(see,* 17 NYCRR part 35) at the Governor's direction were not before Supreme Court and are dehors the certified record on appeal. The same situation pertains to the regulations filed by OGS on March 8, 1988 (9 NYCRR part 342). However, judicial notice may be taken of matters of public record *(Hunter v New York, Ontario & W. R. R. Co.,* 116 NY 615, 621-622; *Matter of Hartman v Joy,* 47 AD2d 624; *Zouppas v Yannikidou,* 16 AD2d 52, 54), including regulations filed by a State agency (CPLR 4511 [a]; *Cruise v New York State Thruway Auth.,* 28 AD2d 1029, 1030) and official Executive memoranda *(Matter of Albano v Kirby,* 36 NY2d 526, 531-532; *People ex rel. Glidden v Nemier,* 133 AD2d 487, 489). Since an appellate court is required to apply the law as it exists at the time of appeal *(Post v 120 E. End Ave. Corp.,* 62 NY2d 19, 28-29), we deem it appropriate to take judicial notice of the Governor's letter and the filed regulations, particularly since the latter are remedial and prospective in nature *(Bradley v Richmond School Bd.,* 416 US 696, 715). Consequently, the deficiencies astutely discerned by Supreme Court—DOT's lack of gubernatorial authority and defendants' failure to properly file their programs *(see,* State Administrative Procedure Act § 102 [2]; § 203)—have been alleviated.

Supreme Court's decision, OGS adopted new regulations which confirm that its DBE program for nonprison contracts is entirely voluntary *(see,* 9 NYCRR part 342). These new regulations bring OGS' program in full compliance with *Matter of Fullilove v Beame (supra)* and its progeny.

Plaintiff's reliance on *Boreali v Axelrod* (71 NY2d 1, *supra)* is unfounded. In *Boreali,* the Court of Appeals found, under the separation of powers doctrine, that the Public Health Council exceeded its lawfully delegated authority by promulgating comprehensive antismoking regulations in areas open to the public *(supra,* at 15-16). *Boreali* represents the unique situation where an executive body that enjoys a broad grant of regulatory authority "transgress[es] the line that separates administrative rule making from legislating" *(supra,* at 16). Here, as indicated, defendants acted pursuant to *specific* legislative directives in implementing the DBE programs, the nuts-and-bolts of which were properly left to the Governor and defendants *(see, Matter of Consolidated Edison Co. v Department of Envtl. Conservation,* 71 NY2d 186, 191; *cf., Boreali v Axelrod, supra,* at 13). By no means are defendants' actions akin to the ultra vires conduct of the Public Health Council denounced by the Court of Appeals in *Boreali.* We further reject plaintiff's contention that the State statutes (Highway Law § 85; Transportation Law § 428) incorporate the Federal acts by reference in violation of NY Constitution, article III, § 16 *(see, Brown v McMorran,* 23 AD2d 661, 662, *supra; see also, People v Gholston,* 130 AD2d 843, *lv denied* 70 NY2d 799). These provisions merely authorize DOT to comply with the relevant Federal guidelines. Finally, defendants are not acting under a Federal delegation of authority, but under direction from the Legislature.

Plaintiff's last argument is that defendants' affirmative action programs deprive plaintiff of equal protection of the laws in violation of NY Constitution, article I, § 11.[3] For equal protection purposes, remedial racial classifications must be subjected to strict judicial scrutiny, a standard that has unfortunately eluded precise definition *(see, United States v Paradise,* 480 US 149, 107 S Ct 1053; *Wygant v Jackson Bd. of Educ.,* 476 US 267, 284-285 [O'Connor, J., concurring]; *Fulli-*

---

3. Plaintiff does not allege that the plans violate the Equal Protection Clause of the 14th Amendment to the US Constitution, or the equal protection component of the Due Process Clause of the 5th Amendment. The governing analysis, however, is the same *(see, Matter of Esler v Walters,* 56 NY2d 306, 313-314).

*love v Klutznick,* 448 US 448, 491-492, *supra).* We deem it appropriate to apply the two-prong analysis delineated in *Wygant v Jackson Bd. of Educ. (supra,* at 274). First, we must determine whether the racial classification is " 'justified by a compelling governmental interest' " *(supra,* at 274, quoting *Palmore v Sidoti,* 466 US 429, 432), and, if so, whether the challenged State action is " 'narrowly tailored' " to achieve that goal *(supra,* at 274, quoting *Fullilove v Klutznick, supra,* at 480). At the outset, we reject plaintiff's equal protection challenge of DOT's regulations as they relate to Federally funded contracts *(see, Fullilove v Klutznick, supra).* As indicated, these regulations are statutorily authorized *(see,* Highway Law § 85; Transportation Law § 428 [1]) and necessary to ensure the continued receipt of Federal highway funds, currently in excess of $500 million annually *(see,* 49 CFR 23.2, 23.41 [a] [1]). The program is designed to ensure that DBEs have a viable opportunity to participate in Federally assisted construction projects in compliance with Federal law *(see,* 49 CFR part 23). The real issue here concerns the constitutional validity of defendants' programs with respect to contracts which are exclusively State-funded *(see,* Transportation Law § 428 [2]; McKinney's Uncons Laws of NY § 6267 [L 1983, ch 56]).

There can be little doubt that the State has a vital interest in addressing the underrepresentation of women and minorities in the construction industry *(see, Fullilove v Klutznick, supra,* at 481). However, a generalized concern for remedying "societal discrimination", that is, discrimination not traceable to the State's own actions, does not justify a racial classification *(Wygant v Jackson Bd. of Educ.,* 476 US 267, 274-275, *supra).* Affirmative action programs must be premised on "convincing evidence that remedial action is warranted" *(supra,* at 277; *see, University of Cal. Regents v Bakke,* 438 US 265, 307). As Justice Powell explained in *Wygant's* three-Justice plurality, "the Court has insisted upon some showing of prior discrimination *by the governmental unit involved* before allowing limited use of racial classifications in order to remedy such discrimination" *(Wygant v Jackson Bd. of Educ., supra,* at 274 [emphasis supplied]). Relying on the italicized language, plaintiff maintains that defendants have failed to establish a compelling governmental interest for the challenged programs because there is no proof in this record of any past or present discrimination by DOT or OGS against the favored groups.

It must be emphasized that DOT and OGS acted pursuant to legislative mandate in implementing these programs *(see,* Transportation Law § 428 [2]; McKinney's Uncons Laws of NY § 6267 [L 1983, ch 56]). Our focus thus becomes whether the State demonstrated an adequate factual predicate for the remedial measures taken. We agree with plaintiff that in the aftermath of *Wygant (supra),* the State must be acting at least in part, to remedy its own unlawful discrimination *(see, Michigan Rd. Bldrs. Assn. v Milliken,* 834 F2d 583, 589-594; *Croson Co. v City of Richmond,* 822 F2d 1355, 1359-1360; *Associated Gen. Contrs. v City & County of San Francisco,* 813 F2d 922, 929-934). This conclusion is not inconsistent with *Fullilove v Klutznick* (448 US 448, *supra),* relied on by defendants. In *Fullilove,* the Supreme Court accepted Congressional findings of discrimination in the construction industry as an adequate factual basis for a 10% set-aside in favor of minority business enterprises. Despite the lack of evidence that Congress itself engaged in any discrimination practices *(supra,* at 528 [Stewart, J., dissenting]), the remedial measure was approved on the confirmation that "private *and governmental* discrimination had contributed to the negligible percentage of public contracts awarded minority contractors" *(supra,* at 503 [Powell, J., concurring] [emphasis supplied]). With evidence of active governmental discrimination on a Federal, State and local level, Congress was clearly not acting solely to remedy "societal discrimination". Moreover, the court expressly emphasized the "broad remedial powers of Congress" in approving the set-aside *(supra,* at 483-484).

We do not, however, read *Wygant v Jackson Bd. of Educ.* (476 US 267, *supra)* as requiring the State to make contemporaneous findings of actual governmental discrimination prior to implementing an affirmative action program *(see, supra,* at 287-294 [O'Connor, J., concurring]). The imposition of such a requirement "would severely undermine public employers' incentive to meet voluntarily their civil rights obligations" *(supra,* at 290; *see, Croson Co. v City of Richmond, supra,* at 1359). Once challenged, however, the State is obligated to establish a "firm basis" for the remedial actions taken *(Wygant v Jackson Bd. of Educ., supra,* at 292). Again, this does not mean that the State is required to establish actual instances of prior unlawful discrimination, but there must be convincing evidence that the "affirmative action plan is appropriate to remedy *apparent* prior employment discrimination" *(supra,* at 292 [emphasis supplied]). For example, statistical

evidence of an abrupt disparity between the actual participation of minority business concerns in public contracts and the percentage of qualified DBEs in the relevant labor pool should suffice *(supra; see, Janowiak v Corporate City of S. Bend,* 836 F2d 1034, 1041-1042; *Croson Co. v City of Richmond, supra,* at 1358-1359).

■ The difficulty here is that Supreme Court did not reach plaintiff's equal protection challenge. Consequently, findings have yet to be made as to whether the State engaged in any past discriminatory practices in the construction industry. In their reply brief, defendants urge that the Legislature had a sufficient predicate for implementing the programs based on the "evidence adduced by Congress as well as other sources".[4] Beyond the fact that reliance on the national findings of discrimination confirmed in *Fullilove v Klutznick* (448 US 448, *supra)* may be inadequate *(see, Croson Co. v City of Richmond, supra,* at 1359; *Groves & Sons v Fulton County,* US Dist Ct, ND Ga, Mar. 30, 1987), the "other sources" have yet to be properly identified and explored on the record. These circumstances prevailing, we deem it appropriate to remit the matter to Supreme Court for a factual determination of whether the challenged programs have a legitimate remedial purpose *(cf., Wygant v Jackson Bd. of Educ., supra,* at 271). In so deciding, we emphasize that plaintiff bears the ultimate burden of establishing the unconstitutionality of the challenged programs *(see, supra).*

■ ■ The question remains whether the challenged programs are "narrowly tailored" to achieve the stated goal *(see, Wygant v Jackson Bd. of Educ., supra,* at 279-284; *Fullilove v Klutznick, supra,* at 507 [Powell, J., concurring]).[5] Notably, plaintiff raises only a facial challenge to the validity of each program without seeking relief for any specific injury *(see, Fullilove v Klutznick, supra,* at 480). Viewed from this perspective, we find defendants' programs, which in large measure track the Federal scheme approved in *Fullilove (supra,* at

---

4. Our examination of the legislative history of Transportation Law § 428 *(see,* L 1983, ch 836) fails to confirm whether the Legislature relied on either Congressional findings of prior discrimination or other similar evidence in authorizing the DBE program *(see,* Governor's mem, 1983 NY Legis Ann, at 358-359).

5. ■ We note that a lesser standard of judicial review pertains to women business enterprises, which focuses on whether the means employed are " 'substantially related' " to the goal of alleviating past discrimination *(see, Michigan Rd. Bldrs. Assn. v Milliken,* 834 F2d 583, 595; *Associated Gen. Contrs. v City & County of San Francisco,* 813 F2d 922, 941-942).

510-515 [Powell, J., concurring]; *see,* 42 USC § 6705 [f] [2]), pass constitutional muster. DOT's DBE program does not impose a fixed, mandatory set-aside, but simply requires contractors to utilize "good faith" efforts in fulfilling participation requirements *(cf., Croson Co. v City of Richmond, supra,* at 1356, 1360-1361 [30% mandatory set-aside]). Participation goals vary from contract to contract depending on a variety of factors, including the availability of qualified minority contractors in a given geographic location *(Fullilove v Klutznick, supra,* at 514 [Powell, J., concurring]). In setting a State-wide goal in 1985 of 12% for DBEs and 2% for women business enterprises, DOT implemented a formula to more uniformly account for variations in geographic location, demographics, past performance of DBEs and the nature of each project. The inherent flexibility of this program consequentially limits the detrimental impact on nonminority contractors *(see, supra).* Because the program is subjected to annual review, the lack of a specific durational limit is not fatal *(see, South Fla. Ch. of Associated Gen. Contrs. v Metropolitan Dade County,* 723 F2d 846, 853-854, *cert denied* 469 US 871; *Ohio Contrs. Assn. v Keip,* 713 F2d 167, 175). OGS' DBE program similarly demands only "good faith" efforts on the part of each contractor. Moreover, with respect to nonprison construction projects, the DBE provisions are fully voluntary *(see,* 9 NYCRR part 342). Clearly, the impact of defendants' programs are far less onerous than the layoff provision rejected as unconstitutionally burdensome in *Wygant v Jackson Bd. of Educ.* (476 US 267, 284, *supra).* In our view, the challenged programs represent a constitutionally appropriate means of redressing identified discrimination against minority contractors.

MAHONEY, P. J., KANE, YESAWICH, JR., and MERCURE, JJ., concur.

Judgment modified, on the law, without costs, by reversing so much thereof as declared defendants' programs invalid; matter remitted to Supreme Court for further proceedings not inconsistent with this court's decision; and, as so modified, affirmed.