**UNITED FENCE & GUARD RAIL CORP., Plaintiff–Appellant,**

v.

**Mario M. CUOMO, Franklin E. White, Horace M. Flowers, Howard L. Sheffey, Defendants–Appellees.**

**No. 490, Docket 88–7681.**

United States Court of Appeals, Second Circuit.

Argued Dec. 7, 1988.

Decided June 26, 1989.

Harry R. Hayes (Hayes & Hayes, Albany, N.Y., of counsel), for plaintiff-appellant.

Marla Tepper, Asst. Atty. Gen., (Lawrence S. Kahn, Deputy Sol. Gen., Suzanne M. Lynn, Asst. Atty. Gen., Chief, Civil Rights Bureau, Robert Abrams, Atty. Gen. of the State of N.Y., New York City, of counsel), for defendants-appellees.

Before KAUFMAN, OAKES and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

Appellant, a New York highway construction company, brought the instant suit in the United States District Court for the Northern District of New York (McCurn, J.) challenging as violative of the Equal Protection Clause of the Fourteenth Amendment, a New York State affirmative action program that is designed to increase the participation of disadvantaged, minority-owned, and women's business enterprises (DBEs) in federally and state-funded highway construction contracts. When the case was before the district court on cross-motions for summary judgment, it made the two rulings at issue on this appeal. It held that the plaintiff's damage claims were barred by the Eleventh Amendment; and, because the same questions are pending before the New York courts in *Rex Paving Corp. v. White*, 139 A.D.2d 176, 531 N.Y.S.2d 831 (3d Dep't 1988), it abstained from exercising jurisdiction and issued a stay under *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), pending resolution of *Rex Paving*. Because we believe it was an abuse of the district court's discretion to abstain, we reverse and remand.

## BACKGROUND

Appellant United Fence and Guardrail Corp., (United Fence) is a New York corporation engaged in the manufacture, sale and installation of guardrails, fences and related highway products. It frequently bids on construction contracts let by the New York State Department of Transportation (NYDOT). United Fence brought the instant action on March 23, 1988 pursuant to 42 U.S.C. § 1983 (1982), alleging that New York's affirmative action program—described in some detail below—violates the Fourteenth Amendment's Equal Protection Clause, and that appellees, as officials of the State of New York acting under color of state law, are enforcing an unconstitutional program. It sought declaratory, injunctive and monetary relief and alleged that, as a firm not certified as a DBE by the NYDOT, it had been unlawfully deprived of construction contracts due to unduly high affirmative action "goals" that were "enforced as quotas."

Appellee Mario M. Cuomo, the Governor of the State of New York, issued Executive Order No. 21 in August of 1983, thereby creating an Office of Contract Compliance and Minority and Women–Owned Business Enterprise, designed to oversee the DBE program. Appellee Franklin E. White, the Commissioner of the NYDOT, is charged with general oversight and enforcement of the affirmative action scheme at issue here, and with development of eligibility criteria for firms seeking DBE certification. *See, e.g.,* N.Y.Comp.Codes R. & Regs. tit. 17, § 35.1 *et seq.* (1988) (hereinafter NYCCRR). Appellee Horace M. Flowers, since December 1986 the Director of the Transportation Affirmative Action Programs Office of NYDOT, is generally in charge of the DBE certification process and conducts periodic review of firms certified and listed in the state directory as DBEs. Until December 1986 appellee Howard L. Sheffey held the position of Director that Flowers now occupies, and is now Coordinator of Regional Affairs for NYDOT. With this brief overview of the parties, the dispute and the district court's holding, we describe the federal precursor to New York's DBE scheme, the New York program itself, and the parallel state court proceeding.

### A. *NYDOT's Affirmative Action Program*

As part of the Public Works Employment Act (Public Works Act) of 1977, Congress included a minority business "set-aside" for certain federally-funded state and local public works projects. *See, e.g.,* 42 U.S.C. § 6705(f)(2) (1982). Section 6705(f)(2) requires that the Secretary of Commerce ensure that at least ten percent of each grant be "expended for minority business enterprises," defined as businesses controlled by "citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts." The Supreme Court has held that this minority business set-aside does not violate the Equal Protection Clauses of the Fourteenth or the Fifth Amendments. *See Fullilove v. Klutznick,* 448 U.S. 448, 490–92, 100 S.Ct. 2758, 2780–82, 65 L.Ed.2d 902 (1980) (plurality opinion); *id.* at 520–22, 100 S.Ct. at 2796–97 (Marshall, J., concurring).

Subsequent legislation, and attendant regulations, require recipients of federal transportation funds to establish DBE programs substantially modeled upon the Public Works Act. *See, e.g.,* Surface Transportation and Uniform Relocation Assistance Act of 1987, Pub.L. No. 100–17, § 128, 101 Stat. 132, 167, *reprinted in* 1987 U.S.Code Cong. & Admin.News 66, 76; 49 C.F.R. §§ 23.41(a)(2) (1987) (applicants "shall implement [a minority enterprise] program"); 23.45 (minority enterprise program components and criteria); 23.61 (implementation of Surface Transportation Act § 105(f)).

As a recipient of a substantial amount of federal transportation assistance, New York has promulgated and implemented the NYDOT "Disadvantaged/Minority/Women Business Enterprise Program." *See* 17 NYCCRR §§ 35.1–.15 (1988). The promulgation of the state program—mandated by the federal laws and regulations noted above—was authorized by New York's Highway Law § 85 that requires the Commissioner of Transportation to comply with federal highway laws, and

New York's Transportation Law § 428, which authorizes the Governor to establish DBE programs for federal and state highway projects. *See* N.Y.High.Law § 85 (McKinney 1979 & Supp.1989); N.Y. Transp.Law § 428(2) (McKinney 1979 & Supp.1989). By letter dated March 7, 1988 Governor Cuomo delegated to Commissioner White the power and the duty to establish the DBE program contained in Title 17. *See* 17 NYCCRR § 35.10.

The New York program tracks the requirements of the federal regulations to a significant degree. *Compare* 49 C.F.R. § 23.53 (providing eligibility criteria for minority enterprise certification), *with* 17 NYCCRR §§ 35.3(a) (defining a DBE owner); 35.3(b) (defining the extent to which a DBE must be owned by persons defined in § 35.3(a)). Essentially, the remedial scheme requires contractors and subcontractors to make good faith efforts to reach goals for minority business participation. *See* 17 NYCCRR § 35.14(f)(1)–(7) (listing the types of activities required to demonstrate good faith efforts to obtain DBE participation in public contract bidding).

These regulatory provisions have now been codified in New York Executive Law, Article 15–A, § 310 *et seq.* (McKinney 1982 & Supp.1989). Article 15–A creates a Governor's Office of Minority and Women's Business Development granting to the Director of the Office broad authority "to encourage and assist contracting agencies in their efforts to increase participation" of DBEs. *Id.* § 311(3)(a). The legislation also details specific language that must be included in contracts, subcontracts, bids on state contracts, and proposals, in order to encourage and ensure equal employment opportunities. *Id.* §§ 312(1), (2). As with earlier regulatory provisions—and like the federal scheme described above—contract language must include provisions requiring contractors to use good faith efforts to solicit state-certified DBEs. *Id.* § 313(2)(a). Contractors who demonstrate such good faith efforts but nonetheless cannot comply with participation requirements may receive a waiver from the contracting agency upon written request. *Id.* § 313(5).

In light of our decision to remand, it is sufficient for our purposes to note that the state program is comprehensive. Review of the program, determination of its actual impact on appellant's business, and its constitutionality under the Equal Protection Clause are more properly the duties of the district court in the first instance.

### B. *Rex Paving Corp. v. White*

The above described DBE program was challenged in the New York courts on a variety of state statutory and constitutional grounds in *Rex Paving Corp. v. White,* 139 A.D.2d 176, 531 N.Y.S.2d 831 (3d Dep't 1988), *aff'g in part, rev'g in part and remanding Rex Paving Corp. v. White,* No. 87–010878 (N.Y.Sup.Ct. Sept. 15, 1987). Plaintiff there sought a declaration that, as a matter of New York law, the DBE program was unlawful because NYDOT Commissioner White lacked specific legislative authorization to implement the remedial scheme. This claim was predicated on an allegation that defendants' failure to file the DBE program with the Secretary of State violated the State Administrative Procedure Act, and on the further assertion that the program contravened the equal protection guarantee of Article I, § 11 of the New York Constitution. *See* 139 A.D. 2d at 180, 531 N.Y.S.2d 831.

A unanimous Appellate Division held that the DBE scheme was properly authorized by the legislature, *see* N.Y.High.Law § 85; N.Y.Transp.Law § 428(2)–(3), which provide the necessary delegation of authority to the Governor. *See* 139 A.D.2d at 182–83, 531 N.Y.S.2d 831; *see also* N.Y. Transp.Law § 428(2)(a) (requiring that the governor "establish measures and procedures to secure meaningful participation" of DBEs). It also noted that Governor Cuomo's letter authorizing the Commissioner of the NYDOT to implement the program had cured any defects in authorization that existed prior to its determination and concluded that defendants' previous failure to file their program properly had likewise been cured. *See* 139 A.D.2d at 183 & n. 2, 531 N.Y.S.2d 831.

Turning its attention to plaintiff's state equal protection challenge, the New York court first applied the two-prong analysis required by the Supreme Court's plurality decision in *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986), to decide whether the program's racial classifications were justified by a compelling governmental interest and, if so, whether the means chosen were "narrowly tailored" to achieve its goals. *See* 139 A.D.2d at 185, 531 N.Y. S.2d 831. Although the state's interest in "addressing the underrepresentation" of minorities in the construction industry was assuredly "vital," the court held that the record was not sufficiently developed to establish the particularized past or present discrimination required by *Wygant*. *See id.* at 187, 531 N.Y.S.2d 831. Thus, it remanded the constitutional issue to the New York Supreme Court for determination of "whether the challenged programs have a legitimate remedial purpose." The Appellate Division went on to hold that, in any case, the program was narrowly tailored enough to comport with the constitution. *See id.* at 188, 531 N.Y.S.2d 831. (noting that NYDOT's remedial scheme closely resembles the federal program upheld in *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980)).

As a consequence, all that remains in the state court proceeding is the constitutional issue of whether the DBE program violates the Equal Protection Clause of the New York Constitution. No further questions regarding the validity of legislative authorization or gubernatorial delegation remain. We observe, as the Appellate Division did, that analysis under the federal and New York State constitutions is the same for purposes of equal protection. *See* 139 A.D. 2d at 184 n. 3, 531 N.Y.S.2d 831.

### C. *The District Court Decision*

The district court ruled from the bench on the parties' cross-motions for summary judgment, granting appellees' motion in part. It held that United Fence's claim for damages against the individual appellees in their representative capacity was barred by the Eleventh Amendment, and also held

that abstention was appropriate under *Pullman* because the federal question before it depended upon the resolution of unclear issues of state law. Moreover, the district court explicitly ruled that the interpretation to be given those state law issues in *Rex Paving* would avoid or modify the federal constitutional issues presented. *See, e.g., McRedmond v. Wilson*, 533 F.2d 757, 761 (2d Cir.1976). Accordingly, it granted an order on June 14, 1988 that stayed the present action pending resolution of these issues of state law in the New York courts. This appeal followed.

## DISCUSSION

### I  Appealability of Pullman Cases

■ We observe preliminarily that the peculiar procedural posture of cases in which abstention is applied brings into question the appealability of the action. But the Supreme Court has held that orders to abstain are final under 28 U.S.C. § 1291 (1982), and that such orders would, in any case, fall within the collateral order exception to the finality rule enunciated in *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225–26, 93 L.Ed. 1528 (1949). *See Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 8–13, 103 S.Ct. 927, 932–36, 74 L.Ed.2d 765 (1983). We thus hold that the order to abstain under *Pullman* is appealable. *See also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 171, 94 S.Ct. 2140, 2149, 40 L.Ed.2d 732 (1974) (stating that finality is given "a practical rather than technical construction"); *Federman v. Empire Fire & Marine Ins. Co.*, 597 F.2d 798, 808 n. 15 (2d Cir.1979) (same).

### II  The Pullman Doctrine

It is helpful to trace the derivation of the *Pullman* doctrine of abstention. The Eleventh Amendment to the United States Constitution states that the judicial power "shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens ... of any Foreign State." This Amend-

ment has long been construed, though not so stated by its terms, to bar suit against a state by its own citizens. *Hans v. Louisiana,* 134 U.S. 1, 18–19, 10 S.Ct. 504, 508–09, 33 L.Ed. 842 (1890). As a consequence, suits against a state by its own, another state's, or a foreign state's citizens were at one time not cognizable in federal courts. This simple jurisprudential consistency unravelled just over 80 years ago when the Supreme Court held in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), that a suit against a state officer acting unconstitutionally was not a suit against a state. The Court so held because it concluded that an officer acting unconstitutionally could not be said to be acting lawfully on behalf of the state. *Id.* at 159–60, 28 S.Ct. at 453–54.

In *Railroad Comm'n v. Pullman,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), a railroad company challenged an order of the Texas Railroad Commission that required all sleeping cars to be "continuously in the charge of [a] ... Pullman conductor." *Id.* at 498, 61 S.Ct. at 644. Previously, trains with only a single sleeper had been in the charge of black porters. Pullman conductors were uniformly white. The Pullman Company asserted that the Commission's order was not authorized under Texas law, and that the order violated the Commerce, Due Process, and Equal Protection Clauses of the Federal Constitution. Justice Frankfurter, writing for the Supreme Court, noted that the sensitive federal claims could be avoided "if a definitive ruling on the state issue would terminate the controversy." *Id.* at 498, 61 S.Ct. at 644. But this ancillary issue involved Texas statutory law, the meaning of which was "far from clear." *Id.* at 499, 61 S.Ct. at 644. The Court therefore held that a policy of avoiding unnecessary federal constitutional adjudication, together with the maintenance of the proper respect for state courts, made abstention appropriate. *See id.* at 498–501, 61 S.Ct. at 644–45.

■ The *Pullman* doctrine counsels that "federal courts should abstain from decision when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Hawaii Hous. Auth. v. Midkiff,* 467 U.S. 229, 236, 104 S.Ct. 2321, 2327, 81 L.Ed. 2d 186 (1984). Properly applied, the doctrine gives due recognition to both the policies of federalism and avoidance of unnecessary constitutional adjudication. But subsequent decisions have clarified that these policies are outweighed by countervailing concerns when a federal court is asked to consider claims involving important federal rights. *See Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 815 n. 21, 96 S.Ct. 1236, 1245 n. 21, 47 L.Ed.2d 483 (1976) ("[T]he presence of a federal basis for jurisdiction may raise the level of justification needed for abstention."); *Law Enforcement Ins. Co. v. Corcoran,* 807 F.2d 38, 40 (2d Cir.1986) (stating that in deciding whether to abstain " 'the balance [is] heavily weighted in favor of the exercise of jurisdiction' " (quoting *Moses H. Cone,* 460 U.S. at 16, 103 S.Ct. at 937)), *cert. denied,* 481 U.S. 1017, 107 S.Ct. 1896, 95 L.Ed.2d 503 (1987). Abstention is the exception, exercise of jurisdiction the rule. *See Alliance of Am. Insurers v. Cuomo,* 854 F.2d 591, 599 (2d Cir.1988).

■ As with the other abstention doctrines, courts should hesitate to invoke the *Pullman* doctrine. The Supreme Court has admonished lower courts that the doctrines of abstention are " 'extraordinary and narrow' " exceptions to the unflagging duty of district courts to adjudicate controversies properly within federal jurisdiction. *See Moses H. Cone,* 460 U.S. at 14, 103 S.Ct. at 936 (quoting *Colorado River,* 424 U.S. at 813, 96 S.Ct. at 1244 and *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188–89, 79 S.Ct. 1060, 1062–63, 3 L.Ed.2d 1163 (1959)). " 'Abdication of the obligation to decide cases can be justified ... only in the exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest.' " *Colorado River,* 424 U.S. at 813, 96 S.Ct. at 1244 (quoting *Mashuda,* 360 U.S. at 188–89, 79 S.Ct. at 1063).

■ The three basic conditions that must be present to trigger *Pullman* abstention reflect the policies that underlie the doctrine: First, the state statute must be unclear or the issue of state law uncertain; second, resolution of the federal issue must depend upon the interpretation given to the ambiguous state provision; and third, the state law must be susceptible of an interpretation that would avoid or modify the federal constitutional issue. *See Zwickler v. Koota,* 389 U.S. 241, 248–49, 88 S.Ct. 391, 395–96, 19 L.Ed.2d 444 (1967); *Alliance of Am. Insurers v. Cuomo,* 854 F.2d at 599. Thus, *Pullman* abstention is appropriate only when a state law is susceptible to an interpretation that will make it unnecessary to decide the federal constitutional question. *Midkiff,* 467 U.S. at 236, 104 S.Ct. at 2327. With these policies and conditions in mind, we analyze United Fence's claims.

### III   Resolution of the Instant Case

#### A.   *The Parties' Contentions*

Stripped to its essentials, appellant's argument is that the DBE scheme in Title 17 and, particularly, the allegedly high "participation goals" are not constitutionally justified under equal protection standards. United Fence alleges that it has been injured by the imposition of these unduly high DBE goals set by appellee White in those NYDOT regions where appellant does most of its business. It asserts that from 1985 until at least March 1988, it received very few contracts or subcontracts despite the fact that it submitted bids for over 70 NYDOT projects. It attributes this alleged loss of business and revenues to DBE participation goals, which it contends appellees enforce as quotas. Moreover, appellant urges that abstention is unwarranted because, it contends, there are no issues of state law which could resolve the substantial federal question it raises. United Fence asserts that its Fourteenth Amendment claim cannot be avoided or modified regardless of the state court's interpretation of state law. It points out that none of its claims are based on state law while, in contrast, *Rex Paving* is solely concerned with issues involving state statutory law, and the provisions of the New York Constitution.

In response, appellees contend that *Pullman* abstention is appropriate because several important issues of New York law remain unsettled, and their resolution would alter the federal constitutional issue presented. In particular, they assert that the issue of whether the state legislature properly authorized appellees' actions remains an open question. That issue is further complicated, appellees assert, by New York's enactment of Article 15–A of the Executive Law after the Appellate Division's decision in *Rex Paving. Rex Paving* did not conclusively decide the authorization issue and, appellees note, in any case, the New York courts should be permitted to construe Article 15–A prior to its interpretation in a federal forum. The ultimate resolution of authorization would alter the federal claim, they believe, because in assessing a race conscious legislative program's constitutional validity, a court must determine initially whether the state actor was authorized to so act. *See, e.g., Fullilove v. Klutznick,* 448 U.S. at 473–75, 100 S.Ct. at 2772–73 (stating that in creating its MBE set-aside, Congress "employed an amalgam of its specifically delegated powers"). Therefore, appellees insist that if a state court upholds Commissioner White's authority to implement the minority business enterprise plan—as did the court in *Rex Paving*—such decision would change the constitutional issue facing a federal court. At the same time, appellees argue that a state court holding striking down the program as unauthorized would moot appellant's federal equal protection claim.

#### B.   *Abstention not Warranted*

■ We recognize that this case presents a thorny issue. But mere complexity is not a sufficient reason to invoke the *Pullman* doctrine. United Fence's complaint alleges what may be characterized as a quintessential federal claim: One that seeks federal review of state action in the sensitive area of race conscious legislation. *See, e.g., City of Richmond v. J.A.*

*Croson Co.,* — U.S. ——, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). Concededly, there is no *per se* rule barring abstention in § 1983 cases. Yet, the federal forum is presumptively always open and responsive to plaintiff's choice of forum given Congress' affirmative grant of jurisdiction, and given the district court's duty to adjudicate, with abstention being but a narrow exception to that general duty. The jurisdictional sword that sustains federal rights should not be swiftly sheathed simply because a concurrent parallel attack has been mounted in the state courts. *See Examining Bd. of Eng'rs, Architects & Surveyors v. Flores De Otero,* 426 U.S. 572, 598, 96 S.Ct. 2264, 2279, 49 L.Ed.2d 65 (1976). Hence, we conclude for several reasons that this appeal does not implicate either the necessary conditions for invoking the *Pullman* doctrine or more importantly, the policies that underlie its proper application.

■ First, the authorization issue is not "far from clear," *Pullman,* 312 U.S. at 499, 61 S.Ct. at 644, and the chances of an erroneous ruling in the federal forum are therefore substantially diminished. *Pullman* abstention requires that the issues of state law be unclear. *See Harman v. Forssenius,* 380 U.S. 528, 534, 85 S.Ct. 1177, 1181–82, 14 L.Ed.2d 50 (1965) ("The [*Pullman*] doctrine ... contemplates that deference to state court adjudication *only* be made where the issue of state law is uncertain.") (emphasis added). Interpretation of patently uncertain state law by federal courts may, if overturned by later authoritative state adjudication, diminish public confidence in federal courts and cause unnecessary friction with state courts. The requirement that the state law must be ambiguous before federal courts abstain ensures that federal courts avoid a decision that guesses at what a state court will do in the future, since a federal court's rough forecast may later be displaced by an authoritative state adjudication. *See Pullman,* 312 U.S. at 500, 61 S.Ct. at 645; *Reid v. Board of Educ.,* 453 F.2d 238, 243 (2d Cir.1971). Accordingly, a federal court should abstain only when the chance of error is reasonably certain, and then only when abstention reduces the likelihood of error. *See* Field, *Abstention In Constitutional Cases: The Scope of the* Pullman *Abstention Doctrine,* 122 U.Pa.L.Rev. 1071, 1090 (1974).

We recognize that when, as here, the question raised is whether state law authorized the challenged enactment, that question implicates different policies from those presented where the issue posed is the actual meaning of the challenged state enactment. Whether the DBE program was properly authorized—whatever the posture of the case may have been at the time of the district court's order—was not so knotty that a federal court decision would have been merely a speculative forecast. *See, e.g., Boreali v. Axelrod,* 71 N.Y.2d 1, 9–14, 523 N.Y.S.2d 464, 517 N.E.2d 1350 (1987); *Subcontractors Trade Ass'n v. Koch,* 62 N.Y.2d 422, 427–30, 477 N.Y.S.2d 120, 465 N.E.2d 840 (1984); *Matter of Fullilove v. Beame,* 48 N.Y.2d 376, 378–79, 423 N.Y.S.2d 144, 398 N.E.2d 765 (1979); *Matter of Fullilove v. Carey,* 62 A.D.2d 798, 800–01, 406 N.Y.S.2d 888 (3d Dep't 1978), *aff'd mem.,* 48 N.Y.2d 826, 424 N.Y.S.2d 183, 399 N.E.2d 1203 (1979). Authorization issues are part of the business of courts. The scope of the abstention doctrine would become inordinately broad were the phrase "far from clear" to be construed as meaning merely "difficult to decide." Here, there is little reason to abstain because an appellate court in New York has determined that the challenged state provision has been properly authorized. Thus, the likelihood of a federal court erring is much decreased.

Second, we disagree with appellees' assertion that, if the newly-enacted Article 15–A of the Executive Law is now the relevant focus of appellant's challenge, then the New York courts should be the first to construe its provisions. The Supreme Court rejected a similar proposition in *Wisconsin v. Constantineau,* 400 U.S. 433, 439, 91 S.Ct. 507, 511, 27 L.Ed.2d 515 (1971). That case involved a facial challenge to a state statute that permitted, without notice or hearing, the "posting" of individuals who, "by excessive drinking," exposed their families "to want." *Id.* at

434, 91 S.Ct. at 508 (quoting Wis.Stat. § 176.26 (1967)). The majority noted that the law was neither ambiguous nor susceptible to a limiting construction. *Id.* at 439, 91 S.Ct. at 511. Therefore, abstention was not warranted merely because the courts of Wisconsin had not yet construed the statute. *See id.* at 438–39, 91 S.Ct. at 510–11.

Similarly, in the present case the district court will apply well-known standards to assess the constitutionality of New York's DBE remedial scheme. As already observed, equal protection analysis is the same under the federal and New York constitutions; thus, the federal court is as competent as its state counterpart to evaluate the validity of Article 15–A. Because the provisions of the Fourteenth Amendment and Article I, Section 11 of the New York Constitution impart an *identical* framework of analysis, there is no affront to the state's interests that warrants deference in the exercise by a federal court of its jurisdiction. It is notable that the Appellate Division in *Rex Paving* cited only federal cases in its discussion of equal protection. *See* 139 A.D.2d at 185–88, 531 N.Y.S.2d 831. Further, to permit state courts to rule first on what are substantially federal constitutional claims is inconsistent with Congress' grant of federal jurisdiction. *See Midkiff,* 467 U.S. at 236–37 & n. 4, 104 S.Ct. at 2326–27 & n. 4 (noting that "[t]he Court has previously determined that abstention is not required for interpretation of parallel state constitutional provisions"); *see also* Field, *supra* at 1082–83.

Third, the federal constitutional issues presented do not depend upon resolution of the state law issues. Appellant challenges the constitutionality of New York's remedial scheme as a whole and does not limit the focus of its attack on its state legislative authorization. United Fence alleges that application of the DBE program from 1985 to March 1988 has caused it substantial economic injury. These issues are sufficiently independent of and distinct from those posed in *Rex Paving* to warrant the exercise of federal jurisdiction. That is to say, there is no state law issue raised in *Rex Paving* the disposition of which will alter, modify, or moot the federal constitutional issue raised in the instant matter. *See Harman v. Forssenius,* 380 U.S. at 534–35, 85 S.Ct. at 1181–82.

## CONCLUSION

Accordingly, we reverse the district court order and remand the case for consideration on its merits. Because of the decision to remand, we do not consider the pendent issue of whether appellant's claim for compensatory damages is barred by the Eleventh Amendment. The district court should rule on this question in the first instance.

Reversed and remanded.