In the Matter of NEW YORK STATE HEALTH FACILITIES ASSOCIA-
TION, INC., Respondent, v DAVID AXELROD, as Commis-
sioner of Health of the State of New York, et al., Appel-
lants.

Third Department, April 19, 1990

**APPEARANCES OF COUNSEL**

*Robert Abrams, Attorney-General (Daniel Smirlock* and *Nancy A. Spiegel* of counsel), for appellants.

*O'Connell & Aronowitz (Cornelius D. Murray, David M. Cherubin* and *Alan B. Ginsburg* of counsel), and *Bernard Schwartz* for respondent.

**OPINION OF THE COURT**

MERCURE, J.

Petitioner is a not-for-profit membership corporation consisting of operators of approximately 230 residential health care facilities (hereinafter RHCF), more commonly known as nurs-

ing homes. Respondent New York State Public Health Council (hereinafter the Council) is a statutory body within the Department of Health *(see,* Public Health Law § 220) consisting of respondent Commissioner of Health and 14 appointees of the Governor. A new RHCF may not be established without Council approval *(see,* Public Health Law § 2801 [1]; § 2801-a) and applicants are required to demonstrate, *inter alia,* that there is a "public need" for the facility (Public Health Law § 2801-a [3]). Public Health Law § 2801-a (10) authorizes the Council to promulgate regulations governing the approval of applications and the revocation, limitation or annulment thereof.

At issue in this litigation is the Council's adoption of regulations known as the "Medicaid Patient Access Regulations", appearing at 10 NYCRR 600.5 (a) (10); 670.1 (a) (5), (6) and (7), and 670.3 (c). The regulations are based on the premise that a RHCF subject to "public need" review *(see,* Public Health Law § 2801-a [3]) should be available to meet the health needs of citizens residing in its locale and that certain groups' access to nursing homes is a valid consideration when determining public need (10 NYCRR 670.3 [c] [1]). Accordingly, the regulations provide that an applicant who voluntarily* participates in the Medicaid program must meet the needs of Medicaid patients in its service area (10 NYCRR 670.3 [c] [2]), "accept-[ing] and admit[ting] at least a reasonable percentage of Medicaid patients", "equal to 75 percent of the annual percentage of all residential health care facility admissions, in the long term care planning area in which the applicant facility is located, that are Medicaid patients" (10 NYCRR 670.3 [c] [2]). The regulations also set forth a broad list of criteria which can be applied to modify the general admissions standard, so as to provide a measure of flexibility (10 NYCRR 670.3 [c] [3]).

Following petitioner's unsuccessful challenge to the regulations pursuant to State Administrative Procedure Act §§ 204 and 205, it commenced this CPLR article 78 proceeding. Supreme Court converted the proceeding into a declaratory judgment action and declared the regulations invalid because they were enacted without express legislative authorization and, in addition, because they violate Public Health Law

---

* Although health care providers may choose to accept no Medicaid patients *(see, Matter of Sigety v Ingraham,* 29 NY2d 110, 115), fewer than 10 nursing homes of more than 600 State-wide choose not to participate in the Medicaid program.

§ 2801-a (9), which, *inter alia,* prohibits corporate-operated nursing homes from discrimination in their admissions practices based on sponsorship (143 Misc 2d 870). This appeal ensued.

We turn first to the Council's assertion that it has not overstepped the bounds of lawfully delegated legislative authority in adopting the challenged regulations. Respondents, relying upon the broad language of Public Health Law § 2801-a (3), maintain that a nursing home's responsiveness to the requirements of the Medicaid-eligible community it serves is necessarily a component of public need review and the subject regulations are the most effective means of assuring that those needs will be met. Petitioner, citing to *Boreali v Axelrod* (71 NY2d 1), claims that the regulations transgressed the Council's rule-making function.

In *Boreali,* the Court of Appeals identified four "coalescing circumstances" *(supra,* at 11) and struck down regulations promulgated by the Council governing smoking in areas open to the public, finding that "the difficult-to-define line between administrative rule-making and legislative policy-making ha[d] been transgressed" *(supra,* at 11). In our view, the four "indicators" analyzed by the *Boreali* court, that the regulations were (1) based on social, economic or political considerations, (2) without legislative guidance, (3) where the Legislature itself had failed to act, and (4) in an area that was not so technical as to require special expertise *(supra,* at 11-14), support our conclusion here that the challenged regulations exceeded the Council's rule-making authority.

First, the Council acted on the basis of patients' socioeconomic status rather than their health needs in determining who is to be afforded access to a limited supply of long-term beds. Thus, the regulations result from the impermissible "balance of trade-offs" approach which occurred in *Boreali (see, supra,* at 12). The second circumstance, creation of a comprehensive set of rules in the absence of articulated policy by the Legislature, applies even more forcefully here than in *Boreali.* The fact that there is absolutely no directive from the Legislature to the Council to adopt a Medicaid admissions quota is fatal, particularly in view of the fact that an affirmative action program may not be established "absent a specific legislative grant of authority" *(Rex Paving Corp. v White,* 139 AD2d 176, 182; *see, Subcontractors Trade Assn. v Koch,* 62 NY2d 422, 429; *Matter of Fullilove v Beame,* 48 NY2d 376, 378; *Matter of Broidrick v Lindsay,* 39 NY2d 641, 649; *cf.,*

*Boreali v Axelrod, supra,* at 11, n 2 [where no affirmative action program was involved]). Thus, it is our view that the Council's actions "were a far cry from the 'interstitial' rule making that typifies administrative regulatory activity" *(Boreali v Axelrod, supra,* at 13).

■ The third consideration here, as in *Boreali,* is that the agency acted in an area in which the Legislature had repeatedly tried and failed to reach agreement *(supra,* at 13). Between 1975 and 1988, 10 bills dealing with admission of nursing home patients based on Medicaid status were introduced in the Legislature. These efforts to secure legislative action were unsuccessful. The Council's argument that the Legislature could simply have concluded that these bills were superfluous is uncompelling, particularly because three of the bills were introduced at the request of the Department of Law and one at the request of the Department of Health itself. Clearly, the fact that the Legislature has not yet chosen to resolve a difficult social problem is not a warrant for administrative action.

Finally, "no special expertise or technical competence in the field of health was involved in the development of the * * * regulations challenged here" *(supra,* 71 NY2d, at 14). Although the Council's regulation of health care facilities involves special expertise, these regulations turn on considerations more appropriate for decision by governmental policy makers than by health experts. In fact, the Council's arguments notwithstanding, it appears to us that the regulations struck down in *Boreali* required more expertise in the field of public health than those considered here, since these are based primarily if not exclusively on socioeconomic, and not medical, considerations. We conclude, therefore, that, in promulgating the challenged regulations, the Council "transgressed the line that separates administrative rule making from legislating" *(supra,* at 16).

■ Moreover, we agree with petitioner that the regulations violate the direction of Public Health Law § 2801-a (9) (d) that a corporate-operated nursing home "shall not discriminate because of * * * sponsor in admission * * * of patients". It is our view that, in interpreting the statute as prohibiting discrimination against Medicaid patients but permitting discrimination in their favor, respondents have tortured the plain and unambiguous language employed by the Legislature *(see, Matter of Washington Post Co. v New York State Ins. Dept.,* 61 NY2d 557, 565; *see also, People v Graham,* 55 NY2d

144, 151; McKinney's Cons Laws of NY, Book 1, Statutes §§ 76, 92, 94). If the Legislature had intended to permit an affirmative action plan, it could have easily done so by indicating that "discriminate", as used in Public Health Law § 2801-a (9) (d), "does not include discrimination against private paying patients" *(see, e.g.,* Executive Law § 296 [12] [providing that a plan to increase the employment of members of a minority group would not constitute an unlawful discriminatory practice]).

In interpreting the statute, we need not rely on respondents' "special competence or expertise", because here "the question is one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent" *(Kurcsics v Merchants Mut. Ins. Co.,* 49 NY2d 451, 459). Because it is well established that a regulation must fail "if it contravenes the will of the Legislature, as expressed in the statute" *(State Div. of Human Rights [Valdemarsen] v Genesee Hosp.,* 50 NY2d 113, 118; *see, Matter of Jones v Berman,* 37 NY2d 42, 53; *see also,* State Administrative Procedure Act § 202-c [4] [a] [v]), the regulations must be invalidated on this basis as well.

Having declared the regulations invalid, we need not and therefore do not address petitioner's alternative arguments.

KANE, J. P., CASEY, WEISS and HARVEY, JJ., concur.

Judgment affirmed, with costs.