*6 OPINION OF THE COURT
Titone, J.
We hold that the Public Health Council overstepped the boundaries of its lawfully delegated authority when it promulgated a comprehensive code to govern tobacco smoking in areas that are open to the public. While the Legislature has given the Council broad authority to promulgate regulations on matters concerning the public health, the scope of the Council’s authority under its enabling statute must be deemed limited by its role as an administrative, rather than a legislative, body. In this instance, the Council usurped the latter role and thereby exceeded its legislative mandate, when, following the Legislature’s inability to reach an acceptable balance, the Council weighed the concerns of nonsmokers, smokers, affected businesses and the general public and, without any legislative guidance, reached its own conclusions about the proper accommodation among those competing interests. In view of the political, social and economic, rather than technical, focus of the resulting regulatory scheme, we conclude that the Council’s actions were ultra vires and that the order and judgment of the courts below, which declared the Council’s regulations invalid, should be affirmed.
I.
LEGISLATIVE BACKGROUND AND REGULATORY SCHEME
More than two decades ago, the Surgeon General of the United States began warning the American public that tobacco smoking poses a serious health hazard. Within the past five years, there has been mounting evidence that even nonsmokers face a risk of lung cancer as a result of their exposure to tobacco smoke in the environment. As a consequence, smoking in the workplace and other indoor settings has become a cause for serious concern among health professionals (see, e.g., Collishaw, Tobacco Smoke in the Workplace, an Occupational Health Hazard, 131 Canadian Med Assocs J [Nov. 15, 1984]; Repace, The Problems of Passive Smoking, Bull of NY Acad of Med, at 936-946 [Dec. 1981]).
This growing concern about the deleterious effects of tobacco smoking led our State Legislature to enact a bill in 1975 restricting smoking in certain designated areas, specifically, libraries, museums, theaters and public transportation facilities (L 1975, ch 80, codified at Public Health Law, art 13-E, *7 §§ 1399-0 — 1399-q). Efforts during the same year to adopt more expansive restrictions on smoking in public places were, however, unsuccessful (see, A-4768, introduced Mar. 4, 1975 [Hevesi] [covering school auditoriums, sports arenas, commercial stores and public elevators]; A-5772, introduced Mar. 4, 1975 [Orazio] [covering elevators and school or college classrooms]; A-7796, introduced Mar. 25, 1975 [Orazio] [covering elevators and school or college classrooms]; A-7199, introduced Mar. 25, 1975 [Cooperman] [elevators, public areas of health care institutions, public waiting rooms of designated health care practitioners, school buildings and indoor sports arenas]). Subsequent attempts to broaden the coverage of the antismoking statute have similarly failed (see, e.g., A-2746, introduced Feb. 1, 1983 [Grannis, Hevesi, Levy and Bennett] [banning smoking in workplace and other indoor areas open to the public, with certain specifically delineated exceptions]). In fact, it is undisputed that while some 40 bills on the subject have been introduced in the Legislature since 1975, none have passed both houses.
In late 1986 the Public Health Council (PHC) took action of its own. Purportedly acting pursuant to the broad grant of authority contained in its enabling statute (Public Health Law § 225 [5] [a]), the PHC published proposed rules, held public hearings and, in February of 1987, promulgated the final set of regulations prohibiting smoking in a wide variety of indoor areas that are open to the public, including schools, hospitals, auditoriums, food markets, stores, banks, taxicabs and limousines. Under these rules, restaurants with seating capacities of more than 50 people are required to provide contiguous nonsmoking areas sufficient to meet customer demand. Further, employers are required to provide smoke-free work areas for nonsmoking employees and to keep common areas free of smoke, with certain limited exceptions for cafeterias and lounges. Affected businesses are permitted to prohibit all smoking on the premises if they so choose. Expressly excluded from the regulations’ coverage are restaurants with seating capacities of less than 50, conventions, trade shows, bars, private homes, private automobiles, private social functions, hotel and motel rooms and retail tobacco stores. Additional "waivers” of the regulations’ restrictions may be obtained from the Commissioner upon a showing of financial hardship (10 NYCRR part 25). Implementation of these regulations, which were to become effective May 7, 1987, has been suspended during the pendency of this litigation.
*8 II.
PROCEDURAL HISTORY
Commenced by several parties affected by the PHC’s anti-smoking regulations, the present litigation was initially brought as an article 78 proceeding, but was later converted to an action for declaratory relief. On motions by all sides for summary judgment, the trial court concluded that the challenged regulations were inconsistent with the policies expressed in Public Health Law article 13-E (imposing more limited restrictions on indoor smoking) and were, accordingly, invalid and unenforceable.
The Appellate Division affirmed the judgment, albeit on a somewhat different theory. Although it rejected the analysis of the trial court, the majority at the Appellate Division was troubled by the possibility of the PHC having virtually "limitless” authority and noted the need to conduct a "realistic appraisal of [that agency’s] powers * * * to constitutionally 'limit the field’ of authority delegated.” (130 AD2d, at 114.) Observing that the PHC’s antismoking regulations "effectuate[d] a profound change in social and economic policy” and that the agency had obviously based the details of its regulatory scheme as much on concerns about "economic impact” as on considerations of public health, the court held that the PHC must be deemed to have acted in excess of its delegated authority.
III.
ANALYSIS
Preliminarily, we stress that this case presents no question concerning the wisdom of the challenged regulations, the propriety of the procedures by which they were adopted or the right of government in general to promulgate restrictions on the use of tobacco in public places. The degree of scientific support for the regulations and their unquestionable value in protecting those who choose not to smoke are, likewise, not pertinent except as background information. Finally, there has been no argument made concerning the personal freedoms of smokers or their "right” to pursue in public a habit that may inflict serious harm on others who must breathe the same air. The only dispute is whether the challenged restrictions were properly adopted by an administrative agency *9 acting under a general grant of authority and in the face of the Legislature’s apparent inability to establish its own broad policy on the controversial problem of passive smoking. Accordingly, we address no other issue in this appeal.
A. The Delegation/Separation of Powers Issue
Section 225 (5) (a) of the Public Health Law authorizes the PHC to "deal with any matters affecting the * * * public health”. At the heart of the present case is the question whether this broad grant of authority contravened the oft-recited principle that the legislative branch of government cannot cede its fundamental policy-making responsibility to an administrative agency. As a related matter, we must also inquire whether, assuming the propriety of the Legislature’s grant of authority, the agency exceeded the permissible scope of its mandate by using it as a basis for engaging in inherently legislative activities. While the separation of powers doctrine gives the Legislature considerable leeway in delegating its regulatory powers, enactments conferring authority on administrative agencies in broad or general terms must be interpreted in light of the limitations that the Constitution imposes (NY Const, art III, § 1).
However facially broad, a legislative grant of authority must be construed, whenever possible, so that it is no broader than that which the separation of powers doctrine permits (see, Tribe, American Constitutional Law § 5-17, at 288-289). Even under the broadest and most open-ended of statutory mandates, an administrative agency may not use its authority as a license to correct whatever societal evils it perceives (see, e.g., Matter of Council for Owner Occupied Hous. v Abrams, 125 AD2d 10). Here, we cannot say that the broad enabling statute in issue is itself an unconstitutional delegation of legislative authority. However, we do conclude that the agency stretched that statute beyond its constitutionally valid reach when it used the statute as a basis for drafting a code embodying its own assessment of what public policy ought to be. Our reasons follow.
Derived from the separation of powers doctrine, the principle that the legislative branch may not delegate all of its lawmaking powers to the executive branch has been applied with the utmost reluctance — even in the early case law. In Wayman v Southard (10 Wheat [23 US] 1, 42-43), for example, Chief Justice Marshall observed: "It will not be contended that Congress can delegate to the Courts, or to any other *10 tribunals, powers which are strictly and exclusively legislative. But Congress may certainly delegate to others, powers which the legislature may rightfully exercise itself * * * [A] general [statutory] provision may be made, and power given to those who are to act under such general provisions to fill up the details” (see also, Buttfield v Stranahan, 192 US 470; Field v Clark, 143 US 649). Similarly, this court stated in Matter of Trustees of Vil. of Saratoga Springs v Saratoga Gas, Elec. Light & Power Co. (191 NY 123, 138) that "[a] review of the * * * judicial authorities in this state * * * clearly shows that while powers inherently and exclusively legislative cannot be delegated, there is a large field in which the legislature * * * 'may certainly delegate to others powers which the legislature may rightfully exercise itself ” (see, e.g., Ross v Arbury, 206 Mise 74, affd 285 App Div 886).[1]
The modern view is reflected in this court’s statement in Matter of Levine v Whalen (39 NY2d 510, 515 [citations omitted]): "Because of the constitutional provision that '[t]he legislative power of this State shall be vested in the Senate and the Assembly’ (NY Const, art III, § 1), the Legislature cannot pass on its law-making functions to other bodies * * * but there is no constitutional prohibition against the delegation of power, with reasonable safeguards and standards, to an agency or commission to administer the law as enacted by the Legislature”. (Accord, Matter of County of Oneida v Berle, 49 NY2d 515; Matter of Bates v Toia, 45 NY2d 460, 464; Matter of City of Utica v Water Pollution Control Bd., 5 NY2d 164.) It is also reflected in many of this court’s decisions upholding legislative delegations of authority that are circumscribed in only the most general of terms (see, e.g., Matter of Levine v Whalen, supra, at 516-517 ["protection and promotion of the health of the inhabitants of the State”; "fit and adequate” facilities]; Matter of Sullivan County Harness Racing Assn. v Glasser, 30 NY2d 269, 277 ["public interest, convenience or *11 necessity”; "best interests of racing generally”]; Martin v State Liq. Auth., 15 NY2d 707 [public convenience and advantage”]). Indeed, the precise provision that is at issue in this case— Public Health Law § 225 (5) (a) — has been upheld against a constitutional challenge based upon the "nondelegation” doctrine (Chiropractic Assn. v Hilleboe, 12 NY2d 109, 119-120).[2]
This does not mean, however, that the regulations at issue here should be deemed valid without further analysis. To the contrary, the courts have previously struck down administrative actions undertaken under otherwise permissible enabling legislation where the challenged action could not have been deemed within that legislation without giving rise to a constitutional separation of powers problem (see, e.g., Industrial Union Dept. v American Petroleum Inst., 448 US 607, 645-646; National Cable Tel. Assn. v United States, 415 US 336, 341-342; Moore v Board of Regents, 44 NY2d 593, 602; Matter of Natilson v Hodson, 264 App Div 384, affd 289 NY 842; cf., Kent v Dulles, 357 US 116; see also, Matter of Consolidated Edison Co. v Public Serv. Commn., 47 NY2d 94, 102).
A number of coalescing circumstances that are present in this case persuade us that the difficult-to-define line between administrative rule-making and legislative policy-making has been transgressed. While none of these circumstances, standing alone, is sufficient to warrant the conclusion that the PHC has usurped the Legislature’s prerogative, all of these circumstances, when viewed in combination, paint a portrait of an agency that has improperly assumed for itself "[t]he open-ended discretion to choose ends” (Tribe, op. cit, at 285), which characterizes the elected Legislature’s role in our system of, government.
First, while generally acting to further the laudable goal of protecting nonsmokers from the harmful effects of "passive smoking,” the PHC has, in reality, constructed a regulatory *12 scheme laden with exceptions based solely upon economic and social concerns. The exemptions the PHC has carved out for bars, convention centers, small restaurants, and the like, as well as the provision it has made for "waivers” based on financial hardship, have no foundation in considerations of public health. Rather, they demonstrate the agency’s own effort to weigh the goal of promoting health against its social cost and to reach a suitable compromise. Indeed, in its "declaration of findings and intent,” the PHC itself asserted: "[Regulations addressing [this] hazard will cause certain economic dislocations and governmental intrusions which must be justified by the nature and extent of the public health hazard. A balance must be struck between safeguarding citizens from involuntary exposure to secondhand smoke on the one hand, and minimizing governmental intrusion into the affairs of its citizens on the other” (10 NYCRR 25.1 [g]).
Striking the proper balance among health concerns, cost and privacy interests, however, is a uniquely legislative function. While it is true that many regulatory decisions involve weighing economic and social concerns against the specific values that the regulatory agency is mandated to promote, the agency in this case has not been authorized to structure its decision making in a "cost-benefit” model (cf., American Textile Mfrs. Inst. v Donovan, 452 US 490, 543-548 [Rehnquist, J., dissenting]) and, in fact, has not been given any legislative guidelines at all for determining how the competing concerns of public health and economic cost are to be weighed. Thus, to the extent that the agency has built a regulatory scheme on its own conclusions about the appropriate balance of trade-offs between health and cost to particular industries in the private sector, it was "acting solely on [its] own ideas of sound public policy” and was therefore operating outside of its proper sphere of authority (Matter of Picone v Commissioner of Licenses, 241 NY 157, 162; see, Packer Coll. Inst. v University of State of N. Y., 298 NY 184, 191). This conclusion is particularly compelling here, where the focus is on administratively created exemptions rather than on rules that promote the legislatively expressed goals, since exemptions ordinarily run counter to such goals and, consequently, cannot be justified as simple implementations of legislative values (see, Matter of Nicholas v Kahn, 47 NY2d 24; see also, People v Klinck Packing Co., 214 NY 121, 138-139). In this regard, the regulations at issue here are fundamentally different from those challenged in Chiropractic Assn. v Hilleboe (supra, at 114-118), *13 where the specific limits on the use of X-ray and fluoroscopic equipment were all promulgated in direct furtherance of the health-related goal of avoiding unnecessary exposure to harmful radiation.
The second, and related, consideration is that in adopting the antismoking regulations challenged here the PHC did not merely fill in the details of broad legislation describing the over-all policies to be implemented. Instead, the PHC wrote on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance. Viewed in that light, the agency’s actions were a far cry from the "interstitial” rule making that typifies administrative regulatory activity (see, Matter of Nicholas v Kahn, supra, at 31; Packer Coll. Inst. v University of State of N. Y., supra, at 190; see also, Tribe, op. cit., at 285).
A third indicator that the PHC exceeded the scope of the authority properly delegated to it by the Legislature is the fact that the agency acted in an area in which the Legislature had repeatedly tried — and failed — to reach agreement in the face of substantial public debate and vigorous lobbying by a variety of interested factions. While we have often been reluctant to ascribe persuasive significance to legislative inaction (see, e.g., Brooklyn Union Gas Co. v State Human Rights Appeal Bd., 41 NY2d 84, 89-90; cf., 41 Kew Gardens Rd. Assocs. v Tyburski, 70 NY2d 325, 335; but see, Matter of Knight-Ridder Broadcasting v Greenberg, 70 NY2d 151; Matter of Bliss v Bliss, 66 NY2d 382, 389), our usual hesitancy in this area has no place here. Unlike the cases in which we have been asked to consider the Legislature’s failure to act as some indirect proof of its actual intentions (see, e.g., Clark v Cuomo, supra, at 190-191), in this case it is appropriate for us to consider the significance of legislative inaction as evidence that the Legislature has so far been unable to reach agreement on the goals and methods that should govern in resolving a society-wide health problem. Here, the repeated failures by the Legislature to arrive at such an agreement do not automatically entitle an administrative agency to take it upon itself to fill the vacuum and impose a solution of its own. Manifestly, it is the province of the people’s elected representatives, rather than appointed administrators, to resolve difficult social problems by making choices among competing ends.
Finally, although indoor smoking is unquestionably a health *14 issue, no special expertise or technical competence in the field of health was involved in the development of the antismoking regulations challenged here. Faced with mounting evidence about the hazards to bystanders of indoor smoking, the PHC drafted a simple code describing the locales in which smoking would be prohibited and providing exemptions for various special interest groups. The antismoking regulations at issue here are thus distinguishable from those at issue in Chiropractic Assn. v Hilleboe (supra, at 120), in which we stressed that the PHC’s technical competence was necessary to flesh out details of the broadly stated legislative policies embodied in the Public Health Law.
In summary, we conclude that while Public Health Law § 225 (5) (a) is a valid delegation of regulatory authority, it cannot be construed to encompass the policy-making activity at issue here without running afoul of the constitutional separation of powers doctrine. Further, the "separability” provision of the agency’s rules (10 NYCRR 25.7) cannot be used to save those rules from the conclusion that, taken as a whole, they are invalid. The PHC’s own "Declaration of findings and intent” makes clear that the agency considered the regulatory scheme it adopted to be an integrated code in which the need to protect citizens from "involuntary exposure to secondhand smoke” was delicately balanced against the goal of minimizing "economic dislocations and governmental intrusions” (10 NYCRR 25.1 [g]). It would be pragmatically impossible, as well as jurisprudentially unsound, for us to attempt to identify and excise particular provisions while leaving the remainder of the PHC’s antismoking code intact, since the product of such an effort would be a regulatory scheme that neither the Legislature nor the PHC intended.
B. Preemption and the Legislature’s Intentions
Plaintiffs have also argued that the Legislature "preempted the field” of indoor smoking by enacting Public Health Law article 13-E, which imposes restrictions on smoking in a narrow class of public locations. However, we decline to adopt this contention as an alternative ground for our holding. The preemption doctrine is most often applied where inferior levels of government have attempted to regulate despite pronouncements on the same subject at a higher governmental level (see, e.g., New York State Club Assn. v City of New York, 69 NY2d 211; Consolidated Edison Co. v Town of Red Hook, 60 NY2d 99; Monroe-Livingston Sanitary Landfill v *15 Town of Caledonia, 51 NY2d 679). It has limited utility where, as here, a perceived conflict between legislative policy and administrative action at the same level of government is at issue. In such cases, the salient inquiry is not whether a higher level of government has demonstrated an intention to preclude local regulation in a particular area, but rather whether the legislative branch of government has shown an intent to grant regulatory authority over a specific subject matter to an administrative agency which exists as part of the coequal executive branch (see, Clark v Cuomo, 66 NY2d 185, 190, supra). The inquiry includes an examination of both the scope of the statute authorizing the regulatory activity and the degree to which the administrative rules are either consistent or "out of harmony” with the policies expressed in the statute (see, e.g., Matter of McNulty v New York State Tax Commn., 70 NY2d 788; Clark v Cuomo, supra; Finger Lakes Racing Assn. v New York State Racing & Wagering Bd., 45 NY2d 471; Matter of Jones v German, 37 NY2d 42, 53; see also, Subcontractors Trade Assn. v Koch, 62 NY2d 422).
Here, it is apparent that the Legislature has given the PHC a wide field for the exercise of its regulatory authority (Public Health Law § 225 [5] [a]; see, Chiropractic Assn. v Hilleboe, supra, at 119-120), and nothing in the Legislature’s 1975 adoption of a limited antismoking provision (Public Health Law art 13-E) suggests a legislative intention to narrow the statutory mandate or exclude the area of smoking restrictions. Although the PHC’s regulations prohibit smoking in a wider variety of indoor settings than do the Legislature’s enactments on the subject, both the regulations and the relevant statutes have a common underlying policy objective — minimizing nonsmokers’ exposure to environmental tobacco smoke (see, Clark v Cuomo, supra). Thus, whether phrased in terms of "preemption” or in terms of consistency with the existing statutory scheme, plaintiffs’ arguments concerning the effect of Public Health Law article 13-E on the PHC’s power to regulate public smoking must fail.
IV.
CONCLUSION
Although Public Health Law § 225 (5) (a) confers broad powers on the Public Health Council and there is no indication that the Legislature intended to circumscribe those powers when it enacted a limited antismoking measure of its own *16 (see, Public Health Law art 13-E), the fundamental constitutional limitations on the respective powers of the legislative and executive branches foreclose a construction of the statute that would include the administrative activity challenged here. In promulgating its antismoking rules, the PHC transgressed the line that separates administrative rule making from legislating and thereby exceeded its statutory powers. Consequently, its actions cannot be upheld.
Accordingly, the order of the Appellate Division should foe affirmed.

. For a brief period in the 1930’s, the Supreme Court dusted off the "nondelegation” principle and breathed new life into it by using the doctrine as a basis for striking down certain New Deal legislation (see, Schechter Corp. v United States, 295 US 495; Panama Ref. Co. v Ryan, 293 US 388). Our court also invoked the doctrine on several occasions to invalidate legislation giving an executive officer or administrative agency what was deemed to be overly broad discretion to establish policy (see, e.g., Packer Coll. Inst. v University of State of N. Y., 298 NY 184, 189-192; Matter of Small v Moss, 279 NY 288; People v Klinck Packing Co., 214 NY 121, 138-139). However, the Schechter-Panama line of cases has, quite rightfully, fallen into disrepute.

. To be distinguished from the cases challenging legislative delegations of authority to administrative agencies are those cases in which an elected executive’s rule-making activities are challenged on the ground that the legislative policy-making prerogative has been usurped. In such cases, we have had less difficulty striking down executive fiats under the separation of powers doctrine, presumably because the challenged actions depended wholly on the executives’ implied authority to enforce the laws, rather than on an express legislative delegation of authority (Matter of Nicholas v Kahn, 47 NY2d 24, 33, n 2; see, e.g., Under 21 v City of New York, 65 NY2d 344; Subcontractors Trade Assn. v Koch, 62 NY2d 422; Rapp v Carey, 44 NY2d 157, 163; Matter of Broidrick v Lindsay, 39 NY2d 641; cf., Clark v Cuomo, 66 NY2d 185; see also, Youngstown Co. v Sawyer, 343 US 579).