[887 NYS2d 452]

In the Matter of Empire State Association of Assisted Living, Inc., et al., Petitioners, v Richard H. Daines, as Commissioner of the New York State Department of Health, Respondent.

Supreme Court, Albany County, September 11, 2009

## APPEARANCES OF COUNSEL

*Hinman Straub, P.C.*, Albany (*David T. Luntz* and *Lori A. Sievers* of counsel), for petitioners. *Andrew M. Cuomo, Attorney General*, Albany (*Shoshanah V. Asnis* of counsel), for respondent. *Schwartzapfel Truhowsky Marcus, P.C.*, Jericho (*Deborah Truhowsky* of counsel), amicus curiae.

## OPINION OF THE COURT

Michael C. Lynch, J.

In this hybrid CPLR article 78 proceeding and declaratory judgment action, petitioner Empire State Association of Assisted Living, Inc., a trade association for adult care facilities and assisted living residences, and the other petitioners, licensed adult care facilities that have applied to the Department of Health (the Department) for licensure as assisted living residences (ALR) under the Assisted Living Reform Act (Public Health Law art 46-B), seek (1) a declaration that respondent Richard H. Daines, Commissioner of the Department (the Commissioner) exceeded his authority in issuing certain regulations associated with article 46-B of the Public Health Law; (2) a judgment nullifying the challenged regulations; and (3) a judgment enjoining the Commissioner and his agents/employees from enforcing those regulations. The Commissioner opposes the petition. Long Term Care Community Coalition, Alzheimer's Association of New York City, NCCNHR: the National Consumer Voice for Quality Long-Term Care, New York State Nurses Association, New York State Long Term Care Ombudsman Program, Assisted Living Consumer Alliance, Friends and Relatives of the Institutionalized Ages, Suffolk County Long Term Care Ombudsman Program, and Coalition of Institutionalized Ages and Disabled seek amicus status to submit a brief opposing the matter.

As to the application for amicus status, "[a]n amicus curiae—friend of the court—is a person appearing in a judicial proceeding to assist the court by giving information or otherwise . . .

[and] is heard only by leave of the court" (1 NY Jur, Actions § 81). Where a case involves " 'questions of important public interest leave is generally granted to file a brief as amicus curiae' " (*Kruger v Bloomberg*, 1 Misc 3d 192, 196 [Sup Ct, NY County 2003], quoting *Matter of Colmes v Fisher*, 151 Misc 222, 223 [Sup Ct, Erie County 1934]). Here, the case concerns questions of important public interest and the movants have shown that they represent a point of view which may not be fully represented by the parties (*see id.* at 198). Accordingly, the court grants the application and accepts the submitted brief.

By way of background, adult care facilities (ACFs) function as a family type home or residence for adults which provide care either temporarily or on a long-term basis "to adults who, though not requiring continual medical or nursing care . . . , are by reason of physical or other limitations . . . unable or substantially unable to live independently" (Social Services Law § 2 [21]; *see New York Coalition for Quality Assisted Living, Inc. v Novello*, 53 AD3d 914, 915 n [3d Dept 2008], *lv denied* 11 NY3d 715 [2009]). Prior to 2004, many of these ACFs referred to themselves as assisted living residences. In an attempt to "clarify, improve and standardize business practices with regard to entities providing assisted living services in New York State" (Budget Report on Bills, Bill Jacket, L 2004, ch 2, at 6) and to "fill[ ] an important statutory and regulatory gap in the state's long term care system" (Bill Jacket, Letter of Support from Senator Hannon), in 2004, the Legislature enacted the Assisted Living Reform Act (L 2004, ch 2 [hereinafter sometimes referred to as the Act]).

The Act was codified as article 46-B of the Public Health Law. In passing the Act, the Legislature found that "the philosophy of assisted living emphasizes aging in place, personal dignity, autonomy, independence, privacy and freedom of choice" (Public Health Law § 4650). Further, the Legislature noted:

"The intent of this article is to create a clear and flexible statutory structure for assisted living that provides a definition of assisted living residence; that requires licensure of the residence; that requires a written residency agreement that contains consumer protections; that enunciates and protects resident rights; and that provides adequate and accurate information for consumers, which is essential to the continued development of a viable market for assisted living. Entities which hold

themselves out as assisted living residences must apply for licensure and be approved by the state to operate as assisted living residences pursuant to this article, and must comply with the requirements of this article" (*id.*).

Article 46-B defines an "assisted living residence" as "an entity which provides or arranges for housing, on-site monitoring, and personal care services and/or home care services (either directly or indirectly), in a home-like setting to five or more adult residents unrelated to the assisted living provider" (Public Health Law § 4651 [1]). "Aging in place" is defined as

"care and services at a facility which possesses an enhanced assisted living certificate which . . . accommodates a resident's changing needs and preferences in order to allow such resident to remain in the residence as long as the residence is able and authorized to accommodate the resident's current and changing needs" (Public Health Law § 4651 [13]).

In the Act, the Legislature empowered the Commissioner to, among other things, promulgate such rules and "regulations as are necessary to implement the provisions" of article 46-B (Public Health Law § 4662 [1] [b]). In addition, the Act created a task force to provide recommendations and to update and revise requirements and regulations applicable to adult care facilities and assisted living residences "to better promote resident choice, autonomy and independence" (L 2004, ch 2, § 5). However, the Act prohibited the Commissioner from enacting emergency regulations (*see* L 2004, ch 2, § 7).

Beginning in 2005, the Department began posting guidelines regarding article 46-B on its Web site. For instance, on July 17, 2005, the Department posted "Enhanced Assisted Living Overview" and "Staffing in ALR/EALR/SNALR."[1] These postings noted that EALRs would be required to have a nurse on site 24 hours a day. During this period, the task force also met to discuss proposed regulations. On March 8, 2007, the Department published a notice of proposed rule making in the State Register, requesting comments on proposed regulations implementing the Act. After receiving comments on the posted documents and proposed regulations, on December 26, 2007, the

---

1. ALR refers to an assisted living residence; EALR refers to an enhanced assisted living residence; SNALR refers to a special needs assisted living residence (*see* Public Health Law § 4651 [1], [13]-[15]; §§ 4654, 4655).

Department published a notice of revised rule making in the State Register. On March 26, 2008, the Commissioner issued regulations in conjunctions with article 46-B and published the notice of adoption (*see* 10 NYCRR part 1001).

It is those regulations which are the subject of this proceeding/action. Petitioners contend that the regulations the Commissioner promulgated (1) violate the plain language of article 46-B; (2) violate the legislative intent of the subject article; (3) fail to promote the development of a sufficient number of EALRs to meet needs; and (4) fail to "recognize that, per legislative mandate, the ALR differs from the ACF in legislatively specified areas" (petition ¶ 56). The petition asserts three causes of action, seeking (1) a declaration that the Commissioner exceeded his authority by issuing regulations and requirements that conflict with the intent of article 46-B of the Public Health Law, (2) a declaration that the challenged regulations are null and void, and (3) an order staying and enjoining the Commissioner from enforcing the regulations. The essence of the Commissioner's response is that petitioners take an unreasonably narrow view of the Act, essentially arguing that the petitioners would have the court believe that the Legislature simply meant to do little more than allow ACFs to call themselves assisted living residences and to function with little change.

" 'The cornerstone of administrative law is derived from the principle that the Legislature may declare its will, and after fixing a primary standard, endow administrative agencies with the power to fill in the interstices in the legislative product by prescribing rules and regulations consistent with the enabling legislation' " (*Matter of Medical Socy. of State of N.Y. v Serio*, 100 NY2d 854, 865 [2003], quoting *Matter of Nicholas v Kahn*, 47 NY2d 24, 31 [1979]). Here, petitioners challenge whether regulations promulgated by the Commissioner under a grant of statutory authority in article 46-B of the Public Health Law are consistent with that enabling legislation.

> "It is well-settled that a State regulation should be upheld if it has a rational basis and is not unreasonable, arbitrary, capricious or contrary to the statute under which it was promulgated. If a regulation is to be nullified, the challenger must establish that 'it is so lacking in reason for its promulgation that it is essentially arbitrary' " (*Kuppersmith v Dowling*, 93 NY2d 90, 96 [1999] [citations omitted], quoting *Matter of Marburg v Cole*, 286 NY 202, 212 [1941]; *see*

*Matter of Consolation Nursing Home v Commissioner of N.Y. State Dept. of Health,* 85 NY2d 326, 331-332 [1995]; *Matter of Adesso [Roberts],* 89 AD2d 662, 662 [3d Dept 1982]).

Further, " '[e]ven under the broadest and most open-ended of statutory mandates, an administrative agency may not use its authority as a license to correct whatever societal evils it perceives' " (*Matter of Medical Socy.,* 100 NY2d at 865, quoting *Boreali v Axelrod,* 71 NY2d 1, 9 [1987]; *see Matter of Beer Garden v New York State Liq. Auth.,* 79 NY2d 266, 276 [1992]).

█ First, petitioners argue that the Commissioner failed to establish an expedited review process for adult care facilities to be licensed as assisted living residences as directed under article 46-B. Petitioners maintain that the licensure requirements subject ACFs in good standing to onerous standards that require them to submit duplicative and costly materials. For instance, petitioners note that ACFs in good standing have to submit an architectural certification showing they meet certain standards already met during their ACF licensing procedure. This, petitioners contend, is in contravention to what the Legislature intended in passing the Act.

Public Health Law § 4652 provides:

"Adult homes and enriched housing programs which possess a valid operating certificate . . . may call themselves assisted living provided they:

"1. file an application for licensure and are approved by the department as assisted living;

"2. comply with all the requirements of this article."

Further, section 4653 provides for the licensure procedure and requirements for assisted living and, as significant here, notes in subdivision (4) that the applicant should give to the Commissioner "any other information the department may deem necessary for the evaluation of the application provided *such information is not duplicative of what is otherwise required of the applicant in obtaining an adult care facility license*" (emphasis supplied).[2] Sections 4654 and 4655 set forth requirements for certification of an EALR. Notably, section 4656 (4) provides: "The department shall develop an expedited review and approval process."

---

**2.** To become licensed as an ALR, an entity must already hold or concurrently apply for ACF status (*see* Public Health Law § 4656 [1]).

■ Next, petitioners argue that the structural and environmental standards set forth in the regulations (10 NYCRR 1001.13)[3] should be nullified since the Commissioner "has failed to demonstrate any rational basis for the new, more stringent requirements for ALRS" (petitioner's mem of law at 13). Moreover, petitioners contend that the additional requirements to become licensed as an ALR are prohibitively expensive and will reduce the number of ACFs able to be licensed ALRs, which is contrary to the legislative intent in passing the Act. Aside from potential renovation expenses to comply with more exacting standards, petitioners note that submission of an architect or an engineer certificate is costly and duplicative of the ACF licensing procedure.

This argument finds support in an affidavit submitted from one of the petitioners which operates an adult care facility—the Adirondack Manor Home for Adults (hereinafter Adirondack). In that affidavit, the ACF operator avers that Adirondack has complied with all ACF building requirements since its licensure in 1996 but the structure would not comply with the new regulations for ALRs. The ACF operator notes that it would cost $50,000—20% of Adirondack's current operating budget—to bring the structure to conformity with ALR regulations to serve the same population that Adirondack is currently serving.

This argument finds further support in letters sent by various members of the State Assembly and Senate to the Commissioner regarding proposed (and now current) promulgated regulations for article 46-B. For instance, Senator George D. Maziarz—the sponsor of the Act—noted:

> "The Law was specifically designed to create a seamless process for existing licensed . . . ACF's to apply for licensure as . . . ALRs, continue to serve the same population as ACFs, and have the right to continue to use the phrase 'assisted living.' The only additional requirement for these facilities was enhanced consumer disclosure . . . It did *not* intend for the Department to impose significant costs upon

---

**3.** The structural and environmental standards set forth in 10 NYCRR 1001.13 provide that an operator of an ALR must comply with certain regulations governing ACFs (*see* 10 NYCRR 1001.13 [a]). Further, that regulation distinguishes between "existing structures" and "new structures," requiring new structures to have certain additional safety features not required by existing structures for ALRs but required for EALRs and SNALRs. Moreover, the regulation requires all structures to have minimum corridor widths of 60 inches (10 NYCRR 1001.13 [d] [2]).

existing operators through additional building, construction, and other environmental standards" (petition, exhibit H, Senator Maziarz Letter, dated May 8, 2007).

State Senator Martin J. Golden noted that 10 NYCRR 1001.13 is "particularly troubling as the varying structural requirements will impose a significant financial burden on many operators. The differences in adult home requirements and assisted living requirements also appear to be unnecessary and arbitrary as an operator which has converted will in many cases be serving the same residents" (petition, exhibit H, Golden Letter, dated May 9, 2007; *see id.*, Assembly Member Harvey Weisenberg Letter, dated May 7, 2009; *id.*, Assembly Member William B. Magnarelli Letter, dated May 9, 2007; *id.*, Assembly Member RoAnn M. Desitto Letter, dated May 7, 2009; *id.*, Senator James L. Seward Letter, dated May 9, 2007; *id.*, Assembly Member Audrey I. Pheffer Letter, dated May 14, 2007; *id.*, Senator Stephen M. Saland Letter, dated May 16, 2007; *id.*, Assembly Member David R. Townsend Letter, dated Mar. 11, 2008 [noting that the Act "(b)uilt upon the existing ACF licensing framework, so that existing ACF providers that had played by the rules all along could obtain the new assisted living residence . . . license without having to comply with burdensome new requirements or incur significant new costs. Indeed, under the 2004 law, the Legislature made clear that the only need (*sic*) additional requirement for already licensed facilities was enhanced consumer disclosure"]; *id.*, Senator William T. Stachowski Letter, dated Mar. 12, 2008; *id.*, Assembly Member Gary D. Finch Letter, dated Mar. 18, 2008 [noting that the new "physical plant requirements will make compliance excessively costly and in many cases, virtually impossible"]; *id.*, Assembly Member John J. McEneny Letter, dated Mar. 3, 2008; *id.*, Assembly Member Donna A. Lupardo Letter, dated Apr. 11, 2008).

The Commissioner contends that these additional requirements were discussed with several groups and arrived at essentially for the protection of the elderly population served by ALRs. Otherwise, the Commissioner contends that the requirement that an architect's or engineer's certification be submitted was meant to expedite review instead of requiring the submission of a full set of architectural documents for review "to ensure that the ACF met minimum standards for licensure" (Commissioner's mem of law at 13). This argument, however, appears unavailing. As highlighted during oral argument held on April 30, 2009, this certification had to be supplied to become

a licensed ACF. Therefore, it appears duplicative of that process and, as such, is in contravention of Public Health Law § 4653 (4).

While the Commissioner's objectives of requiring further safety features for all ALRs and others for new structures appears well motivated and in the interest of assisted living residents, these objectives transgressed the "difficult-to-define line between administrative rule-making and legislative policy-making" (*Boreali*, 71 NY2d at 11). Here, the Legislature set up a system by which existing ACFs in good standing could become licensed in an expedited fashion with the changes between ACFs and ALRs coming in the form of consumer protections and not additional and costly building changes, especially where the basic population being served remains essentially the same.[4] The structural and environmental standards found in 10 NYCRR 1001.13 go beyond that legislative mandate and should accordingly be nullified (*see Boreali*).

▮ Next, petitioners argue that the nursing requirements for EALRs and SNALRs have no rational relation to the actual needs of the residents (*see* 10 NYCRR 1001.11 [j]-[n]). As petitioners note and as this court held in a related case decided herewith:

> "The regulations at issue require, among other things, EALRs and [SNALRs] to have a registered nurse on duty on site eight hours a day, five days a week and a licensed practical nurse on duty eight hours a day, two days a week (*see* 10 NYCRR 1001.10 [m] [4]; 10 NYCRR 1001.11 [j], [m]). These regulations do not comport with Public Health Law § 4659, which provides that an individualized service plan is to be developed for each resident in consultation with the resident's physician and, where necessary, a home care services agency. That plan shall 'include the services to be provided and how *and by whom* services will be provided and accessed' (Public Health Law § 4659 [4] [emphasis supplied]). The [italicized] phrase anticipates that medical services will be provided through the resident's medical provider and not by facility staff. The Court recognizes that an EALR '*may* hire care staff directly . . . or

---

4. This is not to say that additional safety features may not be warranted for EALRs or SNALRs, which issue was not squarely before the court.

contract with a home care services agency . . .' (Public Health Law § 4655 [1] [d] [emphasis supplied]; see also Public Health Law § 4651 [1]). The [italicized] 'may' is not a statutory mandate to hire staff, but permits a facility to do so. Not to be overlooked here is that for a resident to be eligible to live in an EALR, a physician must report that 'the resident is not in need of twenty-four hour skilled nursing care or medical care which would require placement in a hospital or residential health care facility' (Public Health Law § 4655 [2] [b]). Moreover, where a resident's condition changes to require such care, discharge is mandated unless the resident 'hires appropriate nursing, medical or hospice staff to care for his or her increased needs' (Public Health Law § 4655 [4] [a]).

"Contrary to respondent[']s argument, the Court does not find authority for the challenged regulations within Public Health Law § 4655. To the contrary, while Public Health Law § 4655 permits a facility to provide nursing care, the decision to do so remains discretionary. Moreover, the statute expressly imposes the burden on the resident to hire appropriate nursing or medical care when round the clock services become necessary.

"In effect, the challenged regulations impose a hiring and cost obligation upon EALR's that the statute does not embrace. Such a determination to shift the cost of a nursing service from the resident to the facility is an inherently legislative function beyond the scope of respondent's authority (see *Boreali v Axelrod*, supra, 71 NY2d at 9, 11; *see also* McKinney's Cons. Laws of NY, Book 1, Statutes §§ 2, 3). Nor is there any viability in respondent's thesis that the regulation is not prohibited by the Act. This reverse logic contradicts the fundamental premise that the agency may only implement a legislative directive within reason and in a manner 'consistent with the enabling legislation' (*Matter of Medical Socy.*, 100 NY2d at 865). The question is not whether the statute prohibits the challenged regulation, but whether the regulation reasonably implements the legislative directive. This Court finds that it does not." (*Matter of New York Coalition for Quality Assisted Living Inc. v Daines*, 24 Misc 3d 1250[A], 2009 NY Slip Op 51942[U], *4-6 [Sup Ct, Albany

County 2009, Lynch, J.].)

As petitioners also note:

"ACF Regulations (which also apply to all ALRs and EALRs) already require facilities to assist residents with arranging for necessary skilled nursing staff from community sources, such as home care agencies. In the event of an emergency medical situation, the facility will call 911 to assist residents. Moreover, those residents that require skilled nursing need to access the service through an outside certified home health agency in order for Medicare to cover these services" (petition ¶ 83).

In addition, the staffing regulation appears to be inconsistent with the intent of the Legislature in making the possibility of "aging at home" available for low-to-middle-income residents since these staffing requirements will inflate costs. This is further borne out by letters from the 14 members of the State Assembly and Senate (noted above) who all commented that these requirements will increase costs and who also noted, in many cases, that the requirement will be difficult in many rural areas due to nursing shortages. For example, Senator Maziarz noted:

"[W]hile the law grants the Department the authority to require additional care and services in EARL and SNARL certification, the proposed regulation proposes overly burdensome and unreasonable requirements which will make compliance excessively costly and in many cases virtually impossible. For example, the proposed regulations include[ ] minimum nurse staffing levels which fail to take into account the actual needs of the resident population. This requirement is in direct conflict with both the letter and spirit of the law which is to ensure access to care and services tailored specifically to the individual needs of the resident as determined collaboratively by the residents, his or her family, health care providers and the operator. Moreover, such staffing ratios will unnecessarily increase the cost for the resident, and considering the shortage of nurses in the State, will make it virtually impossible to comply, especially in rural communities" (petition, exhibit H, Senator Maziarz Letter, dated May 8, 2007).

While the Commissioner again maintains that such staffing is to help ensure care for the residents, such an objective

transgressed the "difficult-to-define line between administrative rule-making and legislative policy-making" (*Boreali*, 71 NY2d at 11). Accordingly, nullification of the personnel regulation—10 NYCRR 1001.11—is warranted.[5]

■ Next, petitioners argue that the alteration of one of the "residents' rights" was arbitrary and contradicts the statute. The court agrees. Public Health Law § 4660 provides for "[r]ights of residents in assisted living residences," and, specific to here, those rights include the following: "every resident shall have the right to written notice of any fee increase not less than forty-five days prior to the proposed effective date of the fee increase, provided however providing additional services to a resident shall not be considered a fee increase pursuant to this paragraph" (Public Health Law § 4660 [3] [p]). However, when the same fee rights were reiterated in the regulations for article 46-B, the above-cited language was altered to provide:

"Every resident shall have the right to written notice of any fee increase not less than forty-five days prior to the proposed effective date of the fee increase, provided however, providing additional services to a resident in accordance with section 461-c (2) of the Social Services Law, shall not be considered a fee increase pursuant to this paragraph in the following situations:

"(a) if a resident, resident representative or legal representative agrees in writing to a specific rate or fee increase, through an amendment of the residency agreement, due to the resident's need for additional care, services or supplies, the operator may increase such rate upon less than forty-five days' written notice;

"(b) if the operator provides additional care, services or supplies upon the written order of the resident's primary physician, the operator may, through an amendment to the residency agreement, increase such rate upon less than forty-five days' written notice; or

"(c) in the event of an emergency which affects the resident, the operator may assess additional charges

5. The court notes that, while it is nullifying this regulation, it found no merit to the argument that the case management requirements were not in line with the overall intent underlying article 46-B. Thus, the court cannot say that petitioners demonstrated that this requirement is irrational or arbitrary (*see Matter of Consolation Nursing Home*, 85 NY2d at 331-332).

for the benefit of the resident as are reasonable and necessary for services, materials, equipment and food supplies during such emergency" (10 NYCRR 1001.8 [b] [2] [xvi] [a]-[c]).

The regulation as currently written places notice conditions on a change in services that was not contemplated by the statute. Thus, in promulgating this portion of 10 NYCRR 1001.8, the Commissioner exceeded his authority (*Boreali*, 71 NY2d at 9)[6] and its nullification is warranted.

 Petitioners also contend that the schedule of penalties set forth in 10 NYCRR 1001.15 (f) (1) violates the express language of Public Health Law § 4663, which provides:

"Any person who violates any provision of this article or any rule or regulation promulgated by the department, or the terms or conditions of any order or permit issued by the department pursuant to this article, shall be subject to the maximum penalties which may be levied against a licensed adult care facility."

However, a review of the penalties in the challenged regulation reveal they do not differ from those set forth for adult care facilities (*compare* 10 NYCRR 1001.15 [f], *with* 18 NYCRR 486.5). Furthermore, petitioners' argument that this regulation "eliminate[s] the ability for facilities to rectify any non-endangering conditions cited in inspection reports before a fine is imposed" (petitioners' mem of law at 23) is belied by the regulation. That regulation provides that "[u]nless otherwise specified in this section, an operator of an assisted living residence shall be subject to the inspection and enforcement authority, standards and remedies of 18 NYCRR Part 486" (10 NYCRR 1001.15 [a]). Part 486 of 18 NYCRR contains the rectifying provisions that petitioners argue were eliminated. Accordingly, petitioners have not demonstrated that this regulation is arbitrary and capricious to warrant its nullification (*see Kuppersmith*, 93 NY2d at 96; *Matter of Consolation Nursing Home*, 85 NY2d at 331-332).

 Petitioners next contend that the Commissioner exceeded his authority in restricting the right of an ALR operator from

6. This change was highlighted during oral argument using an example of a resident needing additional bathing services. Under section 4660, no notice would need to be given to charge for such additional, needed services while, under the regulation, such notice may need to be given. However, under both the statute and the current regulation notice would need to be given to change the fee structure for such a service.

requiring a guarantor of payment to the residency agreement (*see* 10 NYCRR 1001.8 [f] [4] [xvii]). The part of the regulation challenged provides that

"[t]he residency agreement shall include, at a minimum . . .

"clear notice to the consumer that the operator cannot mandate that a resident or other person agree to a guarantor of payment as a condition of admission unless the operator has reasonably determined, on a case by case basis, that the prospective resident would lack either the current capacity to manage financial affairs and/or the financial means to assure payment due under the residency agreement."

Petitioners argue that nothing in article 46-B allows the Commissioner to limit the right of the operator to insist on a guarantor and is inconsistent with the Legislature's intention to further develop a viable assisted living market. In this instance petitioners have failed to demonstrate that this portion of the regulation is either arbitrary or in contravention of the enabling statute (*see Kuppersmith*, 93 NY2d at 96; *Matter of Consolation Nursing Home*, 85 NY2d at 331-332). The Commissioner explains that this portion of the regulation is consistent with the Department's preexisting practices and, further, was designed to carry out the mandate that "every resident shall have the right to manage his or her own financial affairs" (Public Health Law § 4660 [3] [e]). Thus, nullification of this regulation is not warranted.

■ Likewise, petitioners also contend that the Department exceeded its authority in promulgating a regulation that gives it the power to restrict the alienability of real property by requiring that the Department preapprove the sale of real estate associated with the facility (*see* 10 NYCRR 1001.4 [i] [3]). Petitioners contend that, under the law, an operator only has to demonstrate site control and, thus, the type of restriction demonstrated by this provision is neither expressed in nor contemplated by the Act. In response, the Commissioner argues that the Department has long required that any operator who owns the real estate upon which an adult care facility is located receive approval before the sale of such property. Further, the Commissioner contends that the Social Services Law—which applies to ALRs as well—gives the Department authority to inquire into the "general management and financial condition of the facility" (Social Services Law § 460-c [2] [c]).

The court notes that Public Health Law § 4656 (2) provides that "[a]n assisted living operator shall comply with all applicable statutes, rules and regulations required for maintaining a valid operating certificate issued pursuant to title two of article seven of the social services law." Under that article, the Department has the authority to make inquiries into the financial resources of an adult care facility in the process of licensing such facility and may inquire into other matters as it deems fit (*see* Social Services Law § 461-b [3] [a] [ii], [iii]). The power to inquire into financial affairs, however, does not equate to the power to restrict the sale of property. While the Commissioner may have exercised such power informally, this alone does not give him or the Department the authority to impose such a regulation. That power comes from the authority granted by the Legislature under the enabling statute (*see Matter of Medical Socy.*, 100 NY2d at 865). Here, the regulation at issue appears to exceed that grant of authority and nullification of it is warranted (*Boreali*, 71 NY2d at 11).

The court has considered the parties' remaining arguments and finds them either without merit or unnecessary to reach given its determination.

Accordingly, it is ordered and adjudged that the petition is granted to the extent discussed in the court's decision; and it is further adjudged and declared that the Commissioner exceeded his authority in issuing 10 NYCRR 1001.4, 10 NYCRR 1001.8, 10 NYCRR 1001.11 and 10 NYCRR 1001.13 to the extent discussed in the court's decision; and it if further adjudged and declared that 10 NYCRR 1001.4, 10 NYCRR 1001.8, 10 NYCRR 1001.11 and 10 NYCRR 1001.13 are null and void; and it is further ordered and adjudged that the Commissioner is enjoined from enforcing 10 NYCRR 1001.4, 10 NYCRR 1001.8, 10 NYCRR 1001.11 and 10 NYCRR 1001.13.