Order, Supreme Court, New York County (Margaret A. Chan, J.), entered April 11, 2014, which granted the petitions to the extent of annulling certain “Health Care Rules” promulgated by respondent New York City Taxi and Limousine Commission (TLC), and denied petitioners’ request for restitution of funds deducted pursuant to those rules, unanimously modified, on the law, to grant petitioners’ request for restitution of deducted funds, and otherwise affirmed, without costs.
In 1971, the New York City Council created the New York City Taxi and Limousine Commission (the TLC) for the stated purposes of “continuance, further development and improvement of taxi and limousine service” in New York City (New York City Charter § 2300). The TLC is empowered “to adopt and establish an overall public transportation policy governing taxi, coach, [and] limousine . . . services as it relates to the *436 overall public transportation network of the city” and “to establish certain rates, standards of service, standards of insurance and minimum coverage; standards for driver safety.”
The New York City Charter expressly provides that the TLC’s “regulation and supervision shall extend to” matters including “issuance, revocation [and] suspension of licenses for drivers, chauffeurs, owners or operators of vehicles,” as well as “the establishment of qualifying standards required for such licensees” (New York City Charter § 2303 [b] [5]). The Charter further authorizes the TLC to “prescribe, revise and otherwise regulate reasonable rates of fare which may be charged and collected” for taxi services (New York City Charter § 2304 [b]). Finally, the City Council authorized the TLC to promulgate “rules and regulations reasonably designed to carry out” its purposes (New York City Charter § 2303 [b] [11]; see Administrative Code of City of NY § 19-503 [a] [same]).
Taxi drivers are compensated according to the rules set forth in title 35, chapter 58 of the Rules of the City of New York. Most taxi drivers lease medallion cabs from the medallion owners and make an average of $30,000 to $40,000 per year. The TLC sets maximum lease rates that owners may charge drivers — for example, $115 for any 12-hour day shift (see Rules of City of NY Taxi and Limousine Commission [35 RCNY] § 58-21 [c]). Taxi passengers pay fares using cash, credit or debit cards, and taxi drivers retain fares and tips paid in cash (see 35 RCNY 54-17 [c], [e] [1] [I]). Medallion taxis use a computerized “Taxicab Technology System” (abbreviated as “TPEP”) to handle credit and debit card payments. Each day (or under certain circumstances, each week), medallion owners pay drivers the total amount of all card payments made during the drivers’ shifts, minus various surcharges (see 35 RCNY 58-21 [f] [1l]-[2]; 58-26 [h] [1]).
As to the drivers themselves, the City Council prescribes standards governing their licensure. To that end, the Code specifies that taxi driver license applicants must be “of sound physical condition with good eyesight and no epilepsy, vertigo, heart trouble or any other infirmity of body or mind which might render him or her unfit for the safe operation of a licensed vehicle” (Administrative Code § 19-505 [b] [3]). Applicants must be “examined as to [their] physical condition by a duly licensed physician designated by the [TLC]” (Administrative Code § 19-505 [d]); applicants whose physical exams are “unsatisfactory” “shall be refused a license” (id.). The TLC may make renewal licenses “subject to the same standards and tests as are applicable for original applications” (Administra *437 tive Code § 19-505 [h]). Upon notice and an opportunity for a hearing, the TLC may suspend or revoke the license of any driver who fails to comply with any applicable Code provision (see Administrative Code § 19-505 [1]) or who poses a “direct and substantial threat to the public health or safety” (Administrative Code § 19-512.1 [a]).
Most taxi drivers work as independent contractors, leasing medallion cabs from the owners; as independent contractors, drivers generally lack access to employer-funded health insurance. Additionally, until February 2013, the TLC erroneously believed that taxi drivers who were not entitled to health insurance from medallion owners were also not entitled to disability insurance. However, the New York State Workers’ Compensation Board advised the TLC that medallion owners who are legally required to provide workers’ compensation benefits must also provide them with disability benefits. This disability coverage provides 50% of a driver’s weekly earnings, up to a maximum benefit of $170 per week. Therefore, a driver earning a typical sum of $35,000 per year, or about $700 per week, and covered only by standard disability benefits, would receive less than 25% of that amount ($170) if disabled.
On July 12, 2012, after a public hearing, the TLC voted to approve amendments to its rules governing taxi fares. The amendments increased the fares by 17%; authorized TPEP providers to deduct six cents per fare to be “dedicated for the purpose of providing healthcare services and disability coverage for drivers”; and authorized medallion owners to offset the six-cent charges from credit card payments that passengers made to drivers. According to the amendments, a portion of the proposed 17% fare increase would flow into a fund for driver health care services; the fund would be managed by an outside entity that would help drivers seeking health insurance to navigate the New York State health exchange. The fund would also provide drivers with a “minimum level of disability insurance.” The TLC was also to select a health care assistance entity to provide driver health care and disability coverage.
On September 11, 2013, the TLC issued an Industry Notice that the new rules (the health care rules or the rules) would be effective beginning on October 1, 2013. As promulgated and effective, the health care rules authorized and directed TPEP providers to collect the six-cent per trip fee from medallion owners; required the fee to be dedicated to “providing healthcare services and disability coverage for drivers”; directed medallion owners to offset the six-cent charges from drivers’ credit card receipts; and directed owners to remit the charges *438 to their TPEP providers (see 35 RCNY 58-21 [c] [5] [viii]; [f] [1], [2], [5]; 75-25 [q] [2]).
Meanwhile, on February 6, 2013, the TLC issued a request for proposals (the RFP) from entities for provision of the services contemplated under the Health Care Rules. The RFP stated that the selected contractor would use a projected $10 million in annual fees to, among other things, evaluate health insurance plans offered through the New York State Health Care Exchange, help taxi drivers navigate the Exchange and enroll in a health insurance plan, and obtain subsidies available under the federal Patient Protection and Affordable Care Act (the ACA, commonly known as Obamacare). The RFP noted that the navigation services would be in addition to navigation services already provided by New York State under the ACA, and were to be “specifically tailored to the needs of the taxi driver population.”
An addendum to the RFP further provided that the selected contractor was to negotiate for and buy short-term disability insurance coverage for some 30,000 full-time drivers, with benefits of at least $300 per week for up to 26 weeks. Those disability benefits were to be in addition to disability benefits provided by owners under the Workers’ Compensation Law. On September 25, 2013, the TLC awarded the healthcare services contract to the New York Taxi Workers Alliance (NYTWA), an advocacy group for taxi drivers.
Petitioners* commenced this hybrid CPLR article 78 and declaratory judgment proceeding against respondents City of New York, TLC, and TLC Commissioner David Yasky, seeking a declaration that the health care rules were ultra vires and violated the separation of powers doctrine or, in the alternative, a declaration that the rules were arbitrary and capricious. Petitioners further sought a declaration that the award of the healthcare services contract to NYTWA violated the law and was arbitrary and capricious. In their prayer for relief, petitioners sought an order annulling the health care rules, as well as restitution of monies deducted from drivers’ receipts under the health care rules.
In their answer to the petition, respondents provided an affi *439 davit from a TLC Deputy Commissioner, who explained that the six-cent per-trip deduction was calculated to generate about $10 million per year. That $10 million sum, in turn, was estimated to cover the “cost of enriched disability coverage” of “approximately $3 million” per year, and “provide enough funds to give drivers an appropriate level of healthcare support.” The deputy commissioner did not, however, provide any detail as to how the TLC planned to spend the remaining $7 million (after the $3 million cost of supplemented disability insurance) of the annual $10 million.
The IAS court annulled the health care rules, finding that they were arbitrary and capricious. In its ruling on the consolidated petitions, the court declared that in promulgating the health care rules, the TLC exceeded the authority that the City Council delegated to it, violating the separation of powers doctrine.
Tracking the four factors set forth in Boreali v Axelrod (71 NY2d 1 [1987]), the court found that the TLC had “engaged in its own cost-benefit analysis,” which was properly a function for the legislature. The court also found that there was “no nexus between the requirements for a taxi driver license” as set forth in Administrative Code § 19-505 (b) (3) (relied upon by TLC as legislative authority for the Rules), on the one hand, and “assisting taxi drivers with the [ACA] and supplemental disability coverage,” on the other. The court, accordingly, found that the TLC had not had the “benefit of legislative guidance,” the second Boreali factor.
In addition, the IAS court held that, because the ACA makes express provision for health insurance navigation services and disability insurance coverage, “the legislative branch has spoken” on these issues, militating towards a finding of excess of authority under the third Boreali factor. Finally, as to the fourth Boreali factor, the “special expertise” employed by the agency in promulgating the regulation, the court found, in effect, that the TLC did not have any special expertise in the field of taxi driver health care issues.
The court also rejected the TLC’s assertion that the health care rules were rational because they were “promulgated for the benefit of the taxi drivers who are independent contractors without employer supported health insurance or disability coverage.” In so doing, the court found that the TLC had “provided no basis, rational or otherwise, for the six cents deduction.” The court added that the TLC had provided no “clear defined information on what the six cents are for besides paying for an outside contractor ... to assist taxi drivers [to] *440 navigate the [ACA] — assistance which States provide free of charge to applicants.”
Likewise, the court rejected the argument that the award of the contract to the NYTWA was arbitrary and capricious, finding the argument academic in light of its holding that the rules themselves were arbitrary and capricious. The court added that, in any event, the challenge to the awarding of the contract was untimely as it was not initiated within the requisite 10 days “from obtaining knowledge of the facts on which the challenge [ ] [was] based.”
Notwithstanding its annulment of the rules, the court denied petitioners’ request for damages, i.e., restitution of the six-cent charges withheld under the Rules. In so doing, the court held that the “doctrine of governmental immunity shields respondents” from monetary liability, because the promulgation of the Rules, which precipitated the claim for monetary damages, “is an official action that involves the exercise of discretion or expert judgment in policy matter, and is not exclusively ministerial.”
TLC’s “expansive mandate to develop and improve taxi and limousine service” notwithstanding (Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn., 121 AD3d 21, 28 [1st Dept 2014], stay granted 25 NY3d 957 [2015]), we find that TLC exceeded its authority in promulgating the Health Care Rules (see Boreali v Axelrod, 71 NY2d 1, 9-10 [1987]).
First, the record demonstrates that, in its attempt to establish a cost-effective structure for promoting driver health, TLC, motivated by broad “economic and social concerns,” was making policy, and therefore was “operating outside of its proper sphere of authority” (Boreali, 71 NY2d at 12). Second, TLC manufactured a “comprehensive set of rules without benefit of legislative guidance” (id. at 13). TLC has certain delineated powers to ensure that drivers are capable of driving safely (see New York City Charter § 2300; Administrative Code of City of NY §§ 19-505 [b] [3], [d], [h], [1]; 19-512.1 [a]). However, nothing in the Charter or the enabling code provisions contemplates the establishment and outsourcing of a miniature health insurance navigation and disability insurance department. Third, no expertise in the field of health care services or disability insurance was involved in the development of the rule (indeed, this is not TLC’s area of expertise), a fact highlighted by the lack of technical discussion at the hearings on the proposed rule amendments (see Boreali, 71 NY2d at 13-14; Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene, 23 NY3d 681, 701 [2014]).
*441 The Health Care Rules also lack a rational foundation and are arbitrary and capricious (see New York State Assn. of Counties v Axelrod, 78 NY2d 158, 166 [1991]). The record demonstrates that the six-cent-per-trip charge was carefully calibrated to generate a projected $10 million per year for use in providing drivers with healthcare navigation services and supplemental disability insurance. However, the record fails to show how the $10 million figure was determined or how the money is to be spent. This is the essence of arbitrariness in rate-setting regulation (see New York State Assn., 78 NY2d at 167-168; see also Matter of Catholic Med. Ctr. of Brooklyn & Queens v Department of Health of State of N.Y., 48 NY2d 967 [1979]).
The municipal respondents concede that if the rules are invalidated, petitioners are entitled to a refund of monies collected thereunder (see CPLR 7806; Metropolitan Taxicab Bd. of Trade v New York City Taxi & Limousine Commn., 115 AD3d 521 [1st Dept 2014], lv denied 24 NY3d 911 [2014]; Matter of Adams v Welch, 272 AD2d 642, 644 [3d Dept 2000]).
Concur— Sweeny, J.P., Renwick, Andrias, Moskowitz and Gische, JJ.

 This appeal comprises two proceedings, the first by petitioners Tanvir Ahmed, Charbel Sfeir, and Guy Vieux (collectively, Ahmed) and the second by petitioners Adelso Raul Delorbe, Pedro Sierra, and Samson Zerai (collectively, Delorbe). Ahmed and Delorbe commenced their proceedings separately and the IAS court consolidated the two proceedings for decision. The court also dismissed a third petition, Friendly Group, Ltd., et al. v City of New York et al. (index No. 100019/14). No appeal has been taken from the dismissal of that petition.